**E-FILED**
Wednesday, 31 August, 2005  12:44:43 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| BONNIE J. MASON, INDIVIDUALLY AND AS | ) | Case No. |
| CO-ADMINISTRATOR OF THE ESTATE OF | ) | |
| TRICIA M. MASON, DECEASED, AND | ) | |
| WILLIAM L. MASON, INDIVIDUALLY AND AS | ) | |
| CO-ADMINISTRATOR OF THE ESTATE OF TRICIA | ) | |
| M. MASON, DECEASED | ) | COMPLAINT AND |
| | ) | JURY DEMAND |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SMITHKLINE BEECHAM CORP. D/B/A | ) | |
| GLAXOSMITHKLINE, A PENNSYLVANIA | ) | |
| CORPORATION | ) | |
| Defendant. | ) | |

## COMPLAINT

Now come the Plaintiffs, Bonnie J. Mason and William L. Mason, individually and as co-administrators of the estate of Tricia M. Mason, on behalf of all beneficiaries, survivors and heirs of Tricia M. Mason, deceased, by their attorneys, and complaining against the defendant, SMITHKLINE BEECHAM CORP. D/B/A GLAXOSMITHKLINE ("GSK"), they state:

### Nature of Action

1.      This is an Illinois diversity, products liability, personal injury and wrongful death case arising out of the tragic death of Tricia M. Mason on or about March 2, 2003, in Normal, Illinois.  At the time of her death, Miss Mason was under the influence of a powerful, serotonergic, psychotropic drug called "Paxil CR" which is manufactured and marketed by the defendant GSK.

1

*Jurisdiction and Venue*

2.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §

1332 and pursuant to the principles of supplemental jurisdiction.  There is complete

diversity of citizenship between the named Plaintiffs and the defendant, and the amount in

controversy exceeds $75,000.00, exclusive of interest and costs.

3.      Venue is proper in this Court pursuant to 28 U.S.C § 1391(a).

*The Parties*

4.      Plaintiff Bonnie J. Mason is a competent adult and the surviving mother of

Tricia M. Mason, deceased ("Decedent").  She is a resident of Marquette Heights, Illinois.

She has been duly appointed as co-administrator of the estate of Tricia M. Mason by the

Circuit Court of McLean County, Illinois.  She brings this action on behalf of herself, the

estate of Tricia M. Mason, and all those who have claims or potential claims as

beneficiaries, survivors or heirs of Tricia M. Mason.

5.      Plaintiff William L. Mason is a competent adult and the surviving

father of Tricia M. Mason.  He is a resident of Elmwood, Illinois. He has been duly

appointed as co-administrator of the estate of Tricia M. Mason by the Circuit Court of

McClean County, Illinois.  He brings this action on behalf of himself, the estate of Tricia

M. Mason, and all those who have claims or potential claims as beneficiaries, survivors or

heirs of Tricia M. Mason.

6.      Tricia M. Mason is survived by Plaintiffs and her brother, Eric Mason.

7.       Plaintiffs bring this action pursuant to the Illinois wrongful death statutes.

2

8.    On or about March 2, 2003, the Decedent died by ingesting cyanide while under the influence of the drug Paxil CR (hereinafter "Paxil"), which is manufactured, promoted, marketed, and distributed by GSK.

9.    Defendant SmithKline Beecham Corporation dba GlaxoSmithKline (hereinafter referred to as "GSK") was and still is a corporation duly existing under and by virtue of the laws of the State of Pennsylvania with its domicile and principal place of business in Philadelphia, Pennsylvania.

10.    At all times hereinafter mentioned, defendant GSK was and still is a pharmaceutical company involved in research, development, testing, manufacture, production, promotion, distribution, and marketing of pharmaceuticals for distribution, sale, and use by the general public, including the drug Paxil which is an alleged treatment for depression.

11.    Since 1992 Paxil has been manufactured, produced, marketed, sold, distributed, merchandised, packaged, promoted, and advertised by GSK as an allegedly safe and effective drug for the treatment of depression.  GSK made claims and representations—which were distributed and circulated to the medical profession and to the general public through, among other things, advertising, literature, detail people, brochures, and other methods—that Paxil was a safe and efficacious drug for the treatment of depression.

**General Allegations**

12.    The parties to this suit entered into a tolling agreement in order to toll the applicable statute of limitations.  Consequently, Plaintiffs show that this case has been timely filed pursuant to that agreement.

3

13.     The drug paroxetine is manufactured, promoted, distributed, and marketed by GSK under the trade names Paxil and Paxil CR and is a member of a class of drugs known as "selective serotonin reuptake inhibitors" or "SSRIs."

14.     Like the other SSRIs, there is an association between Paxil and suicidal behavior for some patients who take the drug.  Paxil can cause "side effects" or extrapyramidal reactions, including a dangerous condition called "akathisia" which is associated with acts of self-harm and/or violence.   In addition, Paxil can cause some patients to become manic, hypomanic, or even psychotic.

15.     As do other SSRI manufacturers, GSK touts Paxil as a cure for a chemical imbalance in the brain which is nothing short of speculation.  As one renowned psychiatrist put it: "[SSRIs] are not correcting a biochemical imbalance, these drugs create severe imbalances in the brain ... The idea that human suffering, psychological suffering, is biochemical is strictly a promotional campaign, perhaps the most successful in the history of the world, created by the drug companies. We do not even have a technology, a scientific technology, for measuring what happens inside the brain ... it is literally a fabrication."

16.     Since the licensing of Paxil in 1992, the Federal Food and Drug Administration ("FDA") has received reports under its voluntary reporting program of thousands of suicidal events, including suicide, related to the administration of SSRI drugs, including Paxil, in which the reporting physician or other health-care professional has listed the particular drug as "suspect."  By the FDA's own estimates the reported cases are less than 10% of the represented incidents so that the deaths reported to the FDA stand proxy for more than 20,000 SSRI-related deaths (see website www.fda.gov).  As a result,

the public is at the mercy of the drug companies for which SSRI drugs represent a seven billion dollar annual market. During the clinical trials of Paxil, more than one clinical investigation determined that acts of self-harm were associated with Paxil.

17.     The suicide-violence issue was well known to GSK for many years and well before Miss Mason's death.  This knowledge was first publicly brought to GSK's attention in a February 1990 article by two highly reputed Harvard psychiatrists concerning the association between another SSRI antidepressant, fluoxetine and de novo suicidality.

18.     Journal articles continued to appear in the medical literature throughout the 1990's concerning the risks of SSRIs in relation to akathisia and suicidality.  For instance, a doctor working for another SSRI manufacturer, Pfizer (the maker of Zoloft), wrote about the association and risk of violence and suicide for <u>all</u> SSRI drugs, including Paxil.  *See*, Lane and Baldwin, "SSRI-Induced extrapyramidal side-effects and akathisia: implications for treatment," *Journal of Psychopharmacology*, 12(2)(1998), pp. 192-214; Lane, "Selective Serotonin Reuptake Inhibitor-Induced Serotonin Syndrome: Review," *Journal of Clinical Psychopharmacology*, 17(3)(1997), pp. 208-22.  As Dr. Lane writes, these conditions are sometimes hard to detect and diagnose, although not so hard to treat.  *E.g.* "SSRI-induced akathisia is a relatively rare event but is frequently unrecognized when it does occur . . .  In addition to the obvious motor (objective) manifestations of 'inability to sit still', most researchers agree that akathisia has a strong psychological (subjective) component. . . .  The most outstanding feature of akathisia is the subjective distress. . . . It may be less of a question of patients experiencing fluoxetine-induced suicidal ideation, than patients feeling that 'death is a welcome result' when the acutely discomforting symptoms of akathisia are experienced on top of already distressing disorders."  For this

reason, is it imperative that both physicians and their patients be forewarned and alerted about this serious risk.

19.     GSK is required to warn about the serious hazards associated with its drugs as soon as there is "reasonable evidence of an association."  Despite its knowledge, GSK failed to do so until recently.  GSK began warning of these risks in 2004 and 2005—through a change to its prescribing information Warnings Section or "label" as it is known in the industry.  However, GSK could and should have issued these warnings long before Miss Mason's death.

20.     Before Tricia Mason's death, GSK failed to inform either U.S. healthcare providers or patients of Paxil's known risks as documented in its clinical trials and in the medical literature.  Its U.S. package insert and marketing materials did **not** warn about the association with and risk of akathisia, did **not** warn about the risk of psychosis, and did **not** warn that Paxil is associated with acts of violence and/or self-harm.

21.     GSK aggressively distributed and marketed Paxil, encouraging all types of healthcare providers (including those who have no specialized training or expertise in the mental health field such as the nurse practitioner who prescribed Paxil for Tricia Mason) to dispense and prescribe Paxil, not only for depression but also for other maladies.

22.      GSK advertises Paxil both in professional medical publications and, more recently, in "direct to consumer" advertising.  GSK has so aggressively marketed Paxil that its over-promotion has nullified what warnings GSK has given regarding this drug.  Thus, GSK's legal liability is predicated not only upon those things which it failed to tell prescribing physicians and patients but also on its affirmative misrepresentations.

## <u>COUNT I - NEGLIGENCE</u>

6

23.     Plaintiff incorporates herein by reference Paragraphs 1 through 21 inclusive as though fully set forth at length.

24.     In the Winter of 2003, Decedent took Paxil. The drug was prescribed for Decedent by her nurse practitioner. After beginning her use of Paxil, Decedent experienced Paxil's side effects including, but not limited to, agitation, aggression, and suicidal thinking.  On or about March 2, 2003, Decedent died.

25.     Decedent's injuries and death described herein were caused by the negligence and misrepresentations of GSK through its agents, servants and/or employees acting within the course and scope of their employment including, but not limited to, the following particulars, each of which was a proximate cause of Plaintiff's injuries and damages:

(a)     In failing to adequately warn Tricia M. Mason and her family members, and  her treating physician and nurse practitioner, of the dangers, risks and side effects associated with the taking the prescription medication Paxil;

(b)     In failing to properly investigate the dangers and side effects of Paxil;

(c)     In failing to inform ultimate users, such as Tricia M. Mason, deceased, as to the safe and proper methods of handling and taking Paxil;

(d)     In over-promoting Paxil to all manner of healthcare providers, without regard to their levels of sophistication regarding psychoactive drugs and the diseases for which they should properly be used.

(e)     In failing to provide healthcare providers, including Miss Mason's nurse practitioner and doctor, true and correct information about the safety and efficacy of

7

Paxil, thus depriving healthcare providers from being able to perform a proper risk/benefit assessment regarding the prescription of Paxil.

(f)     In negligently and carelessly representing that Paxil was safe for use when, in fact, it is not; and

(g)     In failing to act as a reasonably prudent drug manufacturer.

26.     As a direct and proximate result of the aforesaid conduct of GSK, Decedent died,  and Plaintiffs have sustained pecuniary loss resulting from the loss of Decedent's society, companionship, comfort, attention, protection, care, love, affection, services, and economic support, and general damages in a sum in excess of the jurisdictional minimum of the Court.

27.     As a further proximate result of GSK's conduct, Plaintiffs have incurred expenses for funeral, burial, and other costs pertaining to Decedent's death in amounts to be ascertained.

**Wherefore**, Plaintiffs pray for judgment against GSK as hereinafter set forth.

## COUNT II - STRICT LIABILITY

28.     Plaintiffs incorporate herein by reference Paragraphs 1 through 26 inclusive as though fully set forth at length.

29.     At all times herein mentioned, Paxil was unsafe for some people who took it, and GSK knew or should have known that said product was unsafe.

30.     At all times herein mentioned, Paxil produced serious and sometimes fatal side effects, and GSK knew or should have known that said product could be unsafe because of said side effects.

31.     At all times hereinafter mentioned and before Decedent's ingestion of Paxil, neither members of the medical community nor members of the general public knew of the dangers existing with respect to Paxil's administration and side effects.

32.     Decedent used Paxil in the manner in which the GSK intended it to be used.

33.     Decedent used or otherwise ingested Paxil in the amounts and manner and for the purpose recommended by GSK.

34.     At all times material hereto, Paxil—in the U.S.—was not accompanied by complete and proper warnings for safe, informed use; the labeling accompanying Paxil did not warn healthcare providers in general and Decedent and her family in particular of the dangers inherent in its use.

35.     Additionally, Paxil was defective and unreasonably dangerous due to Defendant's failure to give adequate instructions with respect to the manner in which their product should be distributed and used.

36.     GSK promoted and maintained Paxil on the market with the knowledge of Paxil's unreasonable risk to the public in general and specifically to Decedent.

37.     Paxil as used by Decedent was defective and unreasonably dangerous when sold by GSK who is strictly liable for the injuries arising from its manufacture and Decedent's use.

38.     As a direct and proximate result of the foregoing, Decedent died, and Plaintiffs have sustained pecuniary loss resulting from the loss of Decedent's society, companionship, comfort, attention, protection, care, love, affection, services, and economic support, and general damages in a sum in excess of the jurisdictional minimum of the Court.

39.     As a further proximate result of GSK's conduct, Plaintiffs have incurred expenses for funeral, burial, and other costs pertaining to Decedent's death in amounts to be proved at trial.

**Wherefore**, Plaintiffs pray for judgment against GSK as hereinafter set forth.

## COUNT III -  BREACH OF IMPLIED WARRANTY

40.     Plaintiffs incorporate herein by reference Paragraphs 1 through 38 inclusive as though fully set forth at length.

41.     Paxil is available in the United States only by prescription.  GSK represented and warranted to healthcare providers and the public in general (the prescribers and users of the product) that Paxil was safe and efficacious.

42.     Decedent used Paxil in accordance with her nurse practitioner's recommendation and in the manner GSK intended.

43.     Decedent did nothing contrary to the packaging insert literature provided by GSK with respect to the use of Paxil.

44.     As a result of GSK's manufacture and sale of Paxil, there arose certain implied warranties running from GSK to Decedent as purchaser and user of Paxil.  Among the implied warranties were that:

      (a)     Paxil was of merchantable quality;

      (b)     Paxil was fit for its primary purpose;

      (c)     Paxil was fit for the particular purpose for which it was intended;

      (d)     Paxil was not defective; and

      (e)     Paxil was safe and efficacious.

45.     Decedent took Paxil in reliance on the skill and judgment of GSK who knew or should have known that Decedent would so rely.

46.     Notwithstanding the above-mentioned warranties and GSK's knowledge or implied knowledge of the ordinary purposes for which Paxil would be used, Paxil was defective when it left GSK's hands, and thus it was unmerchantable and unsuitable for the ordinary and particular purpose for which it was used.

47.     GSK accordingly breached its implied warranties to Decedent.

48.     As a direct and proximate result of GSK's breach of warranty, Decedent died, and Plaintiffs have sustained damages and other losses as set forth herein.

**Wherefore**, Plaintiffs pray for judgment against GSK as hereinafter set forth.

## <u>COUNT IV - BREACH OF EXPRESS WARRANTY</u>

49.     Plaintiffs incorporate herein by reference Paragraphs 1 through 47 inclusive as though fully set forth at length.

50.     At all times herein mentioned, GSK utilized packaging, journal articles, and advertising media to urge the use, purchase, and utilization of Paxil and expressly warranted to healthcare providers, to Decedent, and to other members of the general public that Paxil was effective, safe, and proper for its intended use.

51.     GSK represented to the consumer who would use Paxil and to the healthcare providers who would prescribe it—without a complete disclosure of Paxil's side effects—that Paxil was safe and efficacious for people suffering from depression, which amounted to an express warranty of Paxil's safety and efficacy.

11

52.     GSK knew or in the exercise of reasonable diligence should have known that Paxil had the serious side effects set forth herein.

53.     Decedent relied on GSK's express warranty representations in the use of Paxil, but Paxil was not effective, safe, and proper for its intended use as warranted in that Paxil failed and was dangerous when put to its intended use.

54.     As a direct and proximate result of GSK's breach of express warranty, Decedent died, and Plaintiffs have sustained damages and other losses as set forth herein.

**Wherefore**, Plaintiffs pray for judgment against GSK as hereinafter set forth.

## COUNT V - FRAUD

55.     Plaintiffs incorporate herein by reference Paragraphs 1 through 53 inclusive as though fully set forth at length.

56.     In deciding whether to prescribe a drug, prescribing healthcare providers perform a risk/benefit assessment in determining which drug to prescribe. In doing so providers, such as Decedent's nurse practitioner, rely on the information received about Paxil from various sources, such as journal articles, company literature and discussions with GSK sales people.  Such information must be accurate and provide an unbiased picture of a drug's safety and efficacy in treating a condition.  If the information is false or misleading, the healthcare provider, such as Decedent's nurse practitioner, cannot accurately assess the crucial risk/benefit balance for the patient or exercise professional judgment that is independent. Consequently, the provider, including Decedent's nurse practitioner, cannot act in accordance with the professional and fiduciary obligations owed to

the patient nor can the patient, or in this instance Decedent, give informed consent to the treatment.

57.    Concealing adverse information and providing inaccurate or biased information that is material to a prescribing decision misleads the provider and the patient who relies on that provider's professional judgment.  This is what happened with Decedent and her nurse practitioner, and this is exactly what GSK has done and continues to do. This misleading information, along with omissions of material facts related to Paxil's safety and effectiveness, cause health care providers, patients and the general public to be misled about Paxil's risks and benefits and deprives healthcare providers from making a proper risk/benefit assessment as to the use of Paxil. In internal, unpublished documents, which have been kept from public and regulatory scrutiny via the stratagem of over-broad "confidentiality" designations, GSK has made numerous admissions about Paxil's associated harmful side effects.  Notwithstanding these admissions, in flagrant and conscious disregard and indifference, GSK has denied publicly that such nexus exists, and has failed utterly to take any measures whatsoever to alert the public, the prescribing physicians, and the patients who take it, of these incipient dangers.

58.    Such actions and omissions amount to fraud by GSK. Consequently, it is liable for punitive or exemplary damages under Illinois law.

59.    Additionally, GSK has defrauded the medical profession (including Decedent's nurse practitioner), the Paxil patient population (including Decedent), and the

general public (including, but not limited to Decedent's friends and family) in that it, among other acts:

(a)     Fraudulently mischaracterized and miscoded adverse events involving self-harm so as to reduce the number of occurrences;

(b)     Deliberately changed its reporting requirements so that clinical trial investigators stopped reporting akathisia, a drug-induced condition that significantly increases the risk of self-harm, and instead replaced reports of akathisia with reports of agitation, anxiety, nervousness, and a number of other terms.

(c)     Failed to inform the medical and research communities that a significant number of individuals taking Paxil during clinical trials attempted or committed acts of self-harm, particularly when compared to placebo that was associated with Paxil;

(d)     Fraudulently claimed that Paxil's characteristic side effects of insomnia, agitation and anxiety were of little or no concern when in fact these effects are known to be among the most critical and deadly of the short-term risk factors for self-harm;

(e)     Fraudulently denied Paxil's association with serious or deadly thoughts or acts of self-harm when its own investigators informed GSK (and GSK determined itself) that Paxil was associated with such conditions.

(f)     Allowing the reduction of the dosage of Paxil in clinical trials to lessen side effects in order to avoid the reporting of treatment-emergent adverse events including but not limited to akathisia;

(g)     Allowing the use of concomitant medications in clinical trials to lessen side effects in order to avoid the reporting of treatment-emergent adverse events, such as akathisia;

(h)     Aggressively promoted Paxil to non-psychiatric healthcare providers (the group that GSK has targeted for its promotional activities) while acknowledging that a general practitioner's knowledge, training, and ability to diagnose and treat depression is inadequate;

(i)     Over-promoted Paxil in order to increase its sale by sponsoring award programs for providers; and conducting and sponsoring campaigns to increase the diagnosis of depression by general practitioners; sponsoring lectures and seminars under the guise of education when its true purpose was to increase the sales of Paxil; and

60.     When said representations were made by GSK, it knew those representations to be false, or willfully and wantonly and recklessly disregarded whether the representations were true.  These representations were made by GSK with the intent of defrauding and deceiving the public in general and the medical community and with the intent of inducing the public to take Paxil and the medical community to recommend, prescribe, and dispense Paxil.

61.     At the time the aforesaid representations were made by GSK, and at the time that Tricia M. Mason ingested Paxil, both she and her family/friends and  medical providers were unaware of the falsity of said representations and reasonably relied on GSK's assertions, promulgated through its aggressive sales force to her medical providers as set forth herein, that the drug was safe and effective.

62.     In reliance upon said representations, Tricia M. Mason's medical providers did prescribe Paxil and Miss Mason was induced to and did take Paxil.  Had Miss Mason known of the actual dangers of Paxil, through her medical providers or otherwise, she would not have ingested Paxil, or she would have ceased taking it or otherwise sought help once its side effects (which were clearly known to GSK, but not fully disclosed to such providers or the public) became apparent.

63.     GSK's motive in failing to advise healthcare providers and the public of the adverse reactions that can increase the risk of suicide (and that it knew a percentage of users of the drug inevitably would experience) was for financial gain and its fear that if GSK provided proper and adequate information, Paxil would lose its share of the SSRI market.

64.     At all times herein mentioned, the actions of GSK, their agents, servants, and/or employees were wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of Decedent in particular and to the general public in that GSK did wilfully and knowingly place the dangerous and defective drug Paxil on the market with the specific knowledge that it would be sold to, prescribed for, and used by members of the public.

65.     At all times relevant herein, GSK's conduct was malicious, fraudulent, and oppressive toward Decedent in particular and the public generally, and GSK conducted itself in a willful, wanton, and reckless manner.  Despite GSK's specific knowledge as set forth above, GSK deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, labeled, promoted, and advertised the dangerous and defective

drug Paxil. All of the foregoing constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public.

66.      Thus, GSK is guilty of reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Decedent and others which proximately caused the injuries resulting in Decedent's death.

67.      Therefore, Plaintiffs request punitive and exemplary damages in an amount to be determined at trial to deter GSK from continuing its conscious disregard of the rights and safety of the public at large and to set an example so GSK─as well as other similarly situated drug manufacturers─will refrain from acting in a manner that is wanton, malicious, and in utter, conscious disregard of the rights of a large segment of the public.

**Wherefore**, Plaintiffs pray for judgment against GSK as hereinafter set forth.

### *Prayer*

**Wherefore**, Plaintiffs pray for judgment against GSK as follows:

1.      Awarding Plaintiffs all compensatory damages allowed by Illinois law for herself and all others entitled to such damages under the law.

2.      Awarding Plaintiffs damages for funeral and burial expenses, and for loss of consortium to the extent provided by Illinois law;

3.      Awarding Plaintiffs for costs, disbursements, and prejudgment interest;

4.      Awarding Plaintiffs and Decedent's surviving heirs, all Punitive damages allowed by law; and

5.      Awarding Plaintiffs such legal and other relief as the Court or Jury deems just and equitable.

*Jury Demand*

Plaintiffs demand trial by jury.

Dated: August 31, 2005                Respectfully Submitted,


                                      s/ Philip M. O'Donnell
                                      **PHILIP M. O'DONNELL**
                                      **STEVEN A. WAKEMAN**
                                      **KINGERY, DURREE, WAKEMAN & RYAN,**
                                      **ASSOC.**
                                      **416 MAIN STREET**
                                      **COMMERCE BANK BUILDING, SUITE 915**
                                      **PEORIA, ILLINOIS 61602-1170**
                                      **TEL: (309) 676-3612   FAX: (309) 676-1329**

                                      **CHRISTOPHER L. COFFIN**
                                      **PENDLEY LAW FIRM**
                                      **24110 EDEN STREET**
                                      **POST OFFICE DRAWER 71**
                                      **PLAQUEMINE, LOUISIANA 70765-0071**
                                      **TEL: (225) 687-6396   FAX: (225) 687-6398**

                                      **DONALD J. FARBER**
                                      **LAW OFFICES OF DONALD J. FARBER**
                                      **175 NORTH REDWOOD DRIVE, SUITE 130**
                                      **SAN RAFAEL, CALIFORNIA 94903**
                                      **TEL: (415) 475-7181   FAX: (415) 472-7182**

                                      **KAREN BARTH MENZIES**
                                      **BAUM HEDLUND**
                                      **12100 WILSHIRE BLVD, SUITE 950**
                                      **LOS ANGELES, CA 90025**
                                      **TEL: (310) 207-3233   FAX: (310) 820-7444**


                                      *Attorneys for Plaintiffs*

18