E-FILED
Monday, 12 March, 2007  11:42:55 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| Bonnie J. Mason and,<br>William J. Mason,<br>Individually and as Co-Administrators<br>of the Estate of Tricia M. Mason,<br>Deceased,<br><br>            Plaintiffs,<br><br>      v.<br><br>Smithkline Beecham Corporation,<br>d/b/a/ Glaxosmithkline, a Pennsylvania<br>Corporation,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.  05-CV-1252 |

### OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiffs claims arise from their daughter's suicide while she was taking the drug Paxil.  Plaintiffs allege Defendant, the manufacturer of Paxil, knowingly failed to warn about the dangerous side effects of the drug, including the risk of self-harm, instead misrepresenting Paxil as a safe and effective treatment for depression.  Plaintiffs' counts sound in negligence, strict liability, breach of express and implied warranties, and fraud.  (Complaint, d/e 1).

Before the Court is Plaintiffs' Motion to Compel discovery responses from Defendant GSK and for sanctions (d/e 39), Memorandum in Support (d/e 40), Supplemental Filing by Plaintiffs (d/e 41), Defendant's Response (d/e 45), Plaintiffs' Reply (d/e 47), and Plaintiffs' Corrected Reply (d/e 49).

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) allows parties to obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party.  Relevant information need not be admissible at trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence.  Additionally, for good cause the court may order discovery on matters relevant to the subject matter of the action.  "The good-cause standard warranting broader discovery is meant to be flexible."  Federal Rule of Civil Procedure 26(b)(1) Advisory Committee Notes, 2000 Amendment.  The rule gives the district courts broad discretion in matters relating to discovery.  See Brown-Bey v. United States, 720 F.2d 467, 470-471 (7th Cir.1983); Indianapolis Colts v. Mayor and City Council of Baltimore, 775 F.2d 177, 183 (7th Cir.1985) (on review, courts of appeal will only reverse a decision of a district court relating to discovery upon a clear showing of an abuse of discretion).

Fed. R. Civ. P. 33(b) requires interrogatories to be answered fully to the extent not objectionable.  Grounds for objection must be "stated with specificity."  Fed. R. Civ. P. 33(b)(4).  Fed. R. Civ. P. 36(a) requires an answer to a request for admission to "specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter," or, if "objection is made, the reasons therefor shall be stated."  Additionally, "a denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder."  *Id.*  A matter admitted under Rule 36 is deemed "conclusively established."  Fed. R. Civ. P. 36(b).

## ANALYSIS

After Plaintiffs filed their motion to compel, Defendant supplemented its discovery responses in part, mooting several of the discovery disputes. (d/e 45).  The Court addresses the outstanding requests that still appear in dispute, as identified by Plaintiffs' Reply.  (d/e 49).

### *Interrogatories*

1.  <u>Interrogatory 13</u>: As a matter of fact state what segments, if any, of the 2 page July 6, 2006 report of Anthony J. Rothschild

(a copy of which is attached) YOU disagree with.[1]  (Note: If any aspect of Dr. Rothschild's 2 page report covers suicide issues which YOU have never considered or dealt with in YOUR history of managing Paxil, please state that fact, and your response will be considered legally sufficient in that respect until expert reports are received).

Response: GSK states that it does not disagree with any facts recited in Dr. Rothschild's report.  To the extent this interrogatory asks for more, GSK objects because it is vague, ambiguous, seeks information protected by Illinois law regarding the attorney work-product doctrine, and seeks information that is neither relevant to the subject matter of the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence.  GSK further objects because the interrogatory is overly broad and unintelligible in that the attached report of Dr. Anthony J. Rothschild is not limited to statements of fact, yet Plaintiff's interrogatory requests that GSK respond "as a matter of fact."

Supplemental Response [2]: GSK has fully and sufficiently responded to this interrogatory.  GSK has previously retained and currently utilizes Dr. Anthony J. Rothschild as an expert witness in cases alleging that Paxil causes suicide.  Should GSK designate Dr. Rothschild as an expert in this matter, Plaintiffs will have ample opportunity to learn his views.  For its part, GSK states that it does not disagree with the facts that comprise the segments of Plaintiff's attached report.

---

[1]Dr. Rothschild has been used previously by Defendant as an expert witness. His July 6, 2006 expert report opines that certain analyses do not support a "conclusion that Paxil increases the likelihood of suicide in any adult population."  (d/e 40, Appendix of Discovery Responses (interrogatories) p. 5).

[2]The supplemental response refers to information Defendant provided in its response to the motion to compel, in the attachment to that response, or in the "meet and confer" response.

Plaintiffs contend that the purpose of interrogatory 13 is to "flush out" GSK's contradictory public representations, i.e., its purported acknowledgment in some venues that the risk of Paxil suicide is serious, contrasted with its retention of an expert who "almost demeans the idea that Paxil can cause suicide."  (d/e 49, pp. 1-2; d/e 40, pp. 4-5).  Plaintiffs assert that this interrogatory will force Defendant to "come clean" on its purportedly contradictory stands of "continu[ing] to admit[] in 'suicide warnings' only what it must for FDA purposes, while at the same time paying independent experts to undercut those very admissions."  (d/e 49, p. 2).

The court does not understand how this interrogatory forces Defendant to "come clean" on contradictory positions.  Nor do Plaintiffs sufficiently explain what further information Defendant should have provided in response to this interrogatory.  Defendant has already answered that it agrees with the facts set forth in Dr. Rothschild's July 6, 2006 letter.  Plaintiffs seem to seek to have Defendant agree or disagree with Dr. Rothschild's expert opinions.  Fed. R. Civ. P. 33(c) does state that "[a]n interrogatory otherwise proper is not necessarily objectionable merely because an answer . . . involves an opinion."  However, requiring

Defendant to agree or disagree to Dr. Rothschild's expert opinions in the letter is tantamount to requiring Defendant to set forth the expert testimony on which it will rely in this case.  The court sees nothing improper about Defendant's response that Plaintiffs may delve into the basis of Defendant's expert opinions once experts are designated.[3]

The Court agrees with Defendant that the part of the request directing Defendant to state if it has not considered the issues in the letter is vague and confusing.  It appears that Plaintiffs are asking Defendant to indirectly admit it had no factual basis for its representations about Paxil's safety by admitting that it never considered the issues set forth in the expert report. Even if such a request were clearly stated as a request for admission, the Court could not order Defendant to admit it.  Defendant has already stated that it agrees to the facts in Dr. Rothschild's letter, which satisfies its duties under Rule 33.

2.      Interrogatory 14: Fully state your degree of agreement–or disagreement–with Dr. Rothchild's [sic] defense of Paxil in paragraph 6 of his statement, specifically his statements that "Notably, these findings rest upon extremely sparse date (11 events on Paxil; 1 on placebo), with most of the individual trial

---

[3]The *Kaufman* case cited by Plaintiffs dealt with the court's power to compel an unwilling expert to testify at an antitrust trial pursuant to the government's subpoena. *Kaufman v. Edelstein*, 539 F.2d 811 (2d Cir. 1976).  The court does not understand how *Kaufman* is relevant to this interrogatory.

having zero events in either one or both arms of the study.  The confidence interval for the finding that approaches statistical significance is extremely broad and the data are very fragile (i.e. a change in one event could greatly affect that statical outcome)."  (Note: If YOU have never considered or dealt with this issue in YOUR history of managing Paxil, please state that fact, and your response, though limited, will be considered legally sufficient until expert reports are received).

Response: GSK states that it does not disagree with any facts recited in Dr. Rothschild's report.  By way of further response, GSK states that in its briefing document submitted to FDA, with the referenced analysis, GSK stated that, "It is difficult to conclude a causal relationship between paroxetine and suicidality due to the small incidence and absolute number of events, the retrospective nature of this meta-analysis, and potential for confounding by the fact that the events of interest are a symptom of psychiatric illnesses themselves." [citation omitted]. To the extent this interrogatory asks for more, GSK objects because it is vague, ambiguous, overly broad, seeks information protected by Illinois law regarding attorney work-product doctrine, and seeks information that is neither relevant to the subject matter of the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Response: GSK has fully and sufficiently responded to this interrogatory.  Plaintiffs may disagree with the substance of GSK's response, but that does not change the fact that GSK has complied with its discovery obligation. Moreover, GSK is not being inconsistent, as Plaintiffs suggest, regarding the quantity of data used in the analysis released in 2006 versus the 1992 analysis.

Plaintiffs argue that GSK's response is inconsistent with its embrace

of even sparser data in earlier studies in Defendant's favor.  Plaintiffs

asserts that "Rule 33(c)should be respected in plaintiffs' demand that this inconsistency be addressed."

Plaintiffs argument is advocacy in support of their claims–an attempt to assail Defendant's credibility by pointing out inconsistencies.  Whether Defendant's positions have been inconsistent and, if so, whether those inconsistencies allow the argued inferences, are decisions for summary judgment or trial.  Defendant has met its obligation to answer this interrogatory.

3.   <u>Interrogatory 22</u>: For each patient listed in response to TWENTY ONE[4], fully detail why the omission occurred, and the IDENTITY of the GSK official(s) authorizing the omission.

<u>Response</u>: GSK states that the suicide related events identified in the Article 31 analysis were the product of the use of a computer algorithm–an algorithm which did not exist at the time of the Study 057 report.  GSK will produce, upon the entry of an appropriate protective order, relevant portions of the Article 31 analysis and Study 057, which explain the respective methods of analyses.  To the extent this interrogatory asks for more, GSK objects because it is argumentative, vague, ambiguous, overly broad, not properly limited in time, and seeks information that is neither relevant to the subject matter of the pending litigation nor reasonably calculated to lead to the discovery of

─────────────────

[4]Interrogatory 21 asked for identification by patient number of the Paxil patients Defendant initially recorded as suicide attempts for a 1994 study ("Study 057"), but who were not included in later input to the "CSM Expert Working Group" as "possible suicide related events."  (d/e 39, Appendix of Discovery Responses, p. 9).  GSK answered in response to interrogatory 21 that "suicide related events identified in the Article 31 analysis were the product of the use of a computer algorithm" not in existence at the time of the study report.  *Id.*

admissible evidence.  GSK further objects to Plaintiffs'
assumption that a "GSK official(s) authorized the omission."

Supplemental Response: GSK has fully and sufficiently
responded to this interrogatory.  As GSK has made clear to
Plaintiffs' counsel, no person at GSK "authorized" an "omission"
of data.  As explained in GSK's response, the differences in the
company's Study 057 Final Report and its EMEA submission
are a function of different types of searches for suicide-related
events.

Plaintiffs contend that someone at GSK "authorized 31 original

suicide attempts internally recorded in a 1994 trial be reduced to 27 when

responding to a 2004 question on that matter posed by UK regulatory

authorities . . ."  (d/e 49, p.2).  Defendant denies this.  Plaintiffs may not

believe the answer is truthful, and they may ultimately prove their assertion,

but Defendant has sufficiently met its obligation to answer this

interrogatory.

4.    Interrogatory 24: State all reasons YOU waited until December,
      2001, to inform the FDA that 5 of the 6 placebo suicide
      attempts reported to that agency in April 29, 1991 were run-in
      washout[5] suicide attempts that occurred outside of the

---

[5]According to http://en.wikipedia.org: "Run-in period is a period before a clinical
trial is commenced when no treatment is given. The clinical data from this stage of a
trial are only occasionally of value but can serve a valuable role in screening out
ineligible or non-compliant participants, in ensuring that participants are in a stable
condition, and in providing baseline observations. A run-in period is sometimes called a
washout period if treatments that participants were using before entering the clinical trial
are discontinued."

randomization periods for the trials in question.

Response: . . . GSK further states that it advised FDA, both in the NDA and in the 1991 Report, that the 2 placebo suicides occurred during the run-in period. . . Accordingly, GSK advised FDA, as of 1989 and again in 1991, that placebo run-in events were included in the data presented to FDA.  As Dr. Martin Steiner testified at his deposition in Moffett v. GSK, he was simply unaware at the time the 1991 Report was drafted that 5 of the 6 placebo suicide attempts cited in the report occurred during the run-in period.

GSK states that as of approximately December 2001, the issue of suicide attempts in patients on placebo during the placebo run-in phase began to be internally discussed. . . [O]n April 10, 2002, Dr. David Wheadon and FDA's Dr. Thomas Laughren had a telephone conversation concerning reanalysis by GSK of the data submitted to FDA in 1991.  The details of this conversation were memorialized by Dr. Wheadon in an April 15, 2002 FDA Conversation Record . . .

. . . GSK further objects to Plaintiffs' improper assumption that GSK intentionally waited to inform FDA that 5 of the 6 placebo attempts cited in the 1991 Report occurred during the placebo run-in period.

Supplemental Response: GSK did not make a conscious decision to "wait" to provide information regarding Paxil and suicide.  Accordingly, GSK is unable to provide "reasons" why it allegedly waited. . ..Plaintiffs' counsel may be disappointed that Dr. Steiner did not provide a different answer, but that does not change the fact that GSK has complied with its discovery obligation.

Plaintiffs do not explain how Defendant's answer is unsatisfactory under the Federal Rules, other than that Defendant should not have objected to the word "waited."  Yet, Defendant maintains it did not "wait" to provide the information, to the extent the word "wait" implies a conscious decision.  Defendant's response answers the interrogatory within the meaning of Rule 33.  Semantic haggling over the word "wait" does not change the adequacy of the response for purposes of Rule 33.

*Requests for Admission*

In general, the Court agrees with Defendant that Plaintiffs' requests for admission ("RFA") seem largely an "attempt to utilize Rule 36 as a discovery device on disputed facts . . . and demand[] GSK's interpretation of documents and communications, and . . . admissions of statements containing opinions, conjecture, and suspicions."  (d/e 45, p. 7).  Many of Plaintiffs' requests to admit are phrased with loaded conclusions and characterizations.  The requests more resemble leading questions on cross-examination before a jury than Rule 36 requests to admit.  Plaintiffs attach evidence to show that none of their requests can be reasonably disputed, but, as Defendant correctly notes, "Now is not the time for Plaintiffs to question evidence underlying GSK's responses."  (d/e 45, p. 7).

The factual and legal merit of Defendant's denials must await summary judgment or trial.

The court discusses particular requests for admission in more detail below, combining similar requests where expedient.

1.    Defendant properly objected to RFAs 6, 18, & 19

As discussed above, these requests contain loaded conclusions and characterizations, properly objected to by Defendant.  In RFA 6, Plaintiffs ask Defendant to admit that prescription drug safety in the U.S. depends on truthful applications by drug companies.[6]  RFAs 18 and 19 ask Defendant to admit that Dr. Dunbar was "attentive to detail" and that he had studied Paxil data "extensively" (RFA 18, 19).  The Court agrees that these requests are overly broad and vague–not the sort of matters that can be "conclusively established" under Rule 36.  Defendant has met its duties under Rule 36(a) in "setting forth in detail the reasons why the answering party cannot truthfully admit or deny the matter."

---

[6]GSK "admits" in its response that drug companies "should provide accurate information to FDA in their New Drug Applications ("NDA") to the best of their ability and that this is important for prescription drug safety."  GSK objects to the extent the request implies that every inaccuracy no matter how slight renders the drug unsafe or the information untruthful (d/e 45, p.7).

2.    <u>RFA 21 appears moot</u>

Plaintiffs represent that Defendant's supplemental response to this RFA (set forth in Defendant's opposition, though not in its attached Exhibit A) is acceptable.  Accordingly, the Court considers this request moot.

3.    <u>Defendant's responses to RFAs 55 and 59 about the meaning of a April 29, 1991 document were adequate under Rule 36</u>

Plaintiffs ask Defendant to admit that "Table 1" in an April 29, 1991 document illustrated statistically that "Paxil's patient exposure year result on completed suicides was 5.6 times more favorable than placebo" (RFA 55), and "more than two (2) times more favorable than placebo."[7] (d/e 49). Defendant denied these requests on the grounds that the term "illustrated statistically" was ambiguous and on the grounds that the 1991 document speaks for itself.  In its supplemental response, Defendant admits "that the incidence of suicides on placebo per patient exposure year (.028) is 5.6 times the incidence per patient exposure year (.005) on Paxil."  (d/e 45 p.9).

Plaintiffs assert they are trying to demonstrate that Defendant repeatedly used the "same 'statistics' method to falsely illustrate Paxil's superiority over placebo in the pre-marketing clinical trials."  (d/e 39,

_____

[7]Apparently for suicide attempts.

Appendix of Responses, Requests for Admission, p. 19).  However, now is

not the time to determine the merit of Plaintiffs' claims. Plaintiffs also take

issue with Defendant's objection to the phrase "more favorable," but that

dispute is immaterial to whether Defendant has satisfied its obligations

under Rule 36 to respond to the request.  Defendant's responses

sufficiently meet their obligations under Rule 36, which is all that is required

at this point.

4.    Defendant's responses to RFAs 61 & 79 about information provided
      to the FDA satisfy Rule 36

      RFA 61: In his June, 1991 safety review of Paxil for the FDA,
      Dr. Martin Brecher[8] relied upon contents of GSK's April 29,
      1991 document.

      Response: GSK admits that the April 29, 1991 report was
      provided to FDA.  GSK is without knowledge or information
      sufficient to admit or deny whether Dr. Brecher relied upon the
      contents of GSK's report.

      Supplemental Response: Dr. Brecher's report states that the
      exposure, adverse reactions, and laboratory summaries in his
      report are based on the data submitted in the original NDA and
      other data submitted in the 1991 Annual Report.  Thus, Dr.
      Brecher likely "relied upon" numerous sources of data.  GSK
      has admitted that the April 29, 1991 report was provided to
      FDA.  GSK, however, does not have any further first hand
      knowledge as to whether Dr. Brecher may or may not have
      "relied on" GSK's April 29, 1991 document in drafting his report.
      Plaintiffs' contention that GSK has knowledge as to the

_____

      [8]Of the FDA.

information upon which Dr. Brecher relied is absurd and unsupported.  GSK invites Plaintiffs to call Dr. Brecher to testify before the jury so that he can testify as to what data he relied upon in drafting his report.

Plaintiffs argue that GSK has already admitted "in various scenarios" that Dr. Brecher relied on GSK's data, but they do not explain how Defendant's response does not meet the requirements of Rule 36.  Again, Plaintiffs are arguing what inferences the evidence allows, arguments that belong at summary judgment or trial.  Defendant has already admitted it provided the report to the FDA.  Its response meets its obligations under Rule 36.

> RFA 79: Dr. Wheadon's suicide data briefing to the PDAC omitted the fact that the placebo run in data were included within the placebo figures he was therein presenting was [sic] providing to the panel.
>
> Response: GSK admits that Dr. Wheadon's briefing to the PDAC speaks for itself.  GSK denies the remainder of this request.
>
> Supplemental Response:  GSK admits that Dr. Wheadon's briefing to the PDAC did not expressly state that placebo run-in events were counted in placebo events.

Plaintiffs object to the word "expressly," on the grounds that the word "leaves open the argument GSK's Dr. Wheadon 'implied' run-in events

were counted in placebo events."  (d/e 49, p.3).  The debate over
"expressly" is immaterial to whether Defendant has adequately responded
to the request under Rule 36.  The Court understands Plaintiffs' point is
that GSK inflated the placebo suicide numbers in order to make Paxil's
numbers look good in comparison to the placebo.  That argument belongs
at summary judgment or trial.  Defendant's use of the word "expressly" to
qualify its answer does not make their response insufficient.

5.   <u>Defendant's responses to Plaintiffs' requests to admit regarding Dr.
     Wheadon's telephone conversation with Dr. Thomas Laughren on
     April 10, 2002 satisfy Rule 36: RFAs 92, 96, 98, 101, 102, 104, 105,
     107, 108, 109, 110, 111, 112, 113, 114, 115.</u>

These requests, which need not be separately set forth, all probe a
telephone conversation between Dr. Wheadon and Dr. Laughren on April
10, 2002.  In addition to specifically denying the requests, Defendant
responded that "Dr. Wheadon's April 15, 2002 memorandum, which has
been produced to Plaintiffs, provide GSK's only record of this conversation.
That memorandum speaks for itself.  GSK need not admit or deny what the
memorandum says.  Rather, Plaintiffs can simply read the text of that
document."  (d/e 40, Appendix of Discovery Responses, Rule 36 Requests
for Admissions and Responses, p. 24).  Moreover, Defendant
supplemented its responses to RFAs 92, 96, 98, 101, 102, 104, 105, 107,

108, 109, 110, and 111-115 with additional detailed explanation.  (d/e 45, attachment #1).

Plaintiffs object to Defendant "changing the wording" of the requests for admissions.  For example, Plaintiffs object to Defendant not using the word "desire" in answering RFA 98,[9] but the word has no effect on what is admitted or denied.  Defendant's responses and supplemental responses set forth in detail what it admits to and what it denies.  Defendant has therefore "fairly met the substance of the requested admissions."

6.   <u>Defendant's answers to Plaintiffs requests about studies and statistics satisfy Rule 36: RFAs 41, 119-123, 126-135</u>

<u>RFA 41:</u> It is improper to compute and publish placebo run-in events against placebo for purposes of comparing the study medication and placebo.

<u>Response</u>: GSK denies this request because the term "improper" is vague, ambiguous, and subject to multiple interpretations, and because GSK does not understand the meaning of the phrase "compute and publish placebo run-in events against placebo."

---

[9]RFA 98 stated: "During the April 10, 2002 telephone call, Dr. Wheadon notified Dr. Thomas Laughren that GSK's decision to reanalyze the original NDA data on suicide attempts was based on a desire to henceforth do 'apples to apples' comparisons in presenting the data."  Defendant's supplemental response stated: "GSK admits that during the April 10, 2002 telephone call, Dr. Wheadon notified Dr. Laughren that a decision had been made to reanalyze the original NDA data on suicide attempts, doing the "apples to apples" comparisons. GSK denies the remainder of this request."

Supplemental Response: . . . "if GSK is to understand this request as seeking an admission or denial as to whether it is appropriate to include events occurring during the placebo run-in period in data compilations, GSK believes that it is appropriate, at least for some purposes, especially if the run-in status of the events is acknowledged.  GSK further notes that Dr. Martin Brecher of the FDA expressly included run-in events in submissions.  GSK also notes that its April 29, 1991 Suicidal Ideation and Behavior report states that all data from worldwide studies, "irrespective of time on therapy," were considered for the analysis of safety and the reporting of adverse experiences."

Plaintiffs maintain Defendant's response "remains totally unacceptable," but they do not explain how it fails to meet Rule 36's requirements.  (d/e 49, p. 6).  Plaintiffs' arguments go to the truth of Defendant's response, not to its adequacy under Rule 36.

RFAs 119, 120: The "apples to apples" approach constituted a change to the methodology of presenting suicide data that had been used to compare Paxil and placebo in the April 29, 1991 document.  (RFA 119).  The "apples to apples" approach constituted a change to the methodology of presenting suicide data that had been used to compare Paxil and placebo before the 10/5/92 PDAC."  (RFA 120).

Response: GSK objects to this request as vague and ambiguous with respect to the phrase "a change to the methodology of presenting."  The phrase "a change to the methodology of presenting" is subject to varying meanings and interpretations.  GSK is not able to admit or deny whether the "apples to apples" approach constituted a "change to the methodology of presenting suicide data."

<u>Supplemental Response</u>:  GSK admits that the "apples to apples" analyses were performed in the 2002/2003 submissions pertaining to the original NDA data; that such analyses were not included in the April 29, 1991 report; and that the "apples to apples" approach was taken to address concerns like those of Plaintiffs' counsel in this case about the inclusion of placebo run-in events in calculations involving the incidence of suicide-related events. Based on the concern that the calculations did not exclude events from non-randomized phases of clinical trials, GSK performed "apples to apples" calculations that looked solely at either placebo-controlled or comparator-controlled data. Thus, in addition to excluding run-in events, such calculations also properly excluded events from uncontrolled trials and open label extensions. The point of the analysis is to include only those parts of the trials that are being compared, but exclude the others in order to have a balanced analysis — i.e., "apples to apples."

Plaintiffs ask the Court to order Defendant to fully respond, using Plaintiffs' "change to the methodology" phrase.  However, in the Court's view, Defendant has fully responded within the meaning of Rule 36. Defendant has explained in detail the "apples to apples" approach and has admitted that analysis was not included in the 1991 report.  Regardless of the quibble over "change to methodology of presenting" Defendant has "fairly met the substance" of the request under Rule 36.

<u>RFAs 121-122:</u> GSK's methodology of comparing Paxil and placebo suicide event data in the April 29, 1991 document [or,

for RFA 122, before the 10/5/92 PDAC] did not distinguish between placebo controlled trials and active drug controlled trials.[10]

RFA 123:  GSK's methodology of comparing Paxil and placebo suicide event data before the 10/5/92 PDAC did not distinguish between data collected during controlled studies and that collected during uncontrolled studies.

Response to 121-22: GSK admits that the April 29, 1991 report did not contain analyses of placebo-controlled or comparator-controlled data only.   GSK admits that the presentation of suicide data before the 1992 PDAC did not contain analyses of placebo-controlled or comparator-controlled date only.  [GSK denied the remainder of the requests].

Response to 123: GSK admits that the presentation of suicide data before the PDAC did not contain analyses of placebo-controlled or comparator-controlled data only.  GSK denies the remainder of this request.

Supplemental Response: GSK admits that the April 29, 1991 report and the October 5, 1992 presentation to the PDAC did not contain analyses of placebo-controlled or comparator-controlled data only.  GSK denies these requests insofar as GSK presented data for placebo and comparator events in the NDA and the 1991 Report.  Further, the NDA contained final reports for clinical trials and other data collected during placebo controlled, active drug controlled and uncontrolled trials.

Plaintiffs argue that the responses are "mumble jumble" and that

Defendant did not answer whether it "distinguished between" these trials.

(d/e 49, p.7).  However, Plaintiffs do not explain how the responses fail to

---

[10]The Court infers that "active drug controlled" refers to a study in which the new treatment is compared to an existing treatment, rather than to a placebo treatment.

meet the substance of the requests.  Plaintiffs are again arguing the merits of their case.  Defendant's responses satisfy Rule 36's requirements, the only inquiry before the Court.

RFAs 126-135: These requests all ask for admissions about what the reported results would have been if the "placebo run in suicide attempts" had been excluded, as Plaintiffs assert they should have been.[11] Defendant denied the requests, "in part because the calculation proposed is not a valid statistical method for analyzing safety data."  Defendant's supplemental responses further explain its position that:

> though the Plaintiff's proposed numbers are correct as worded, "it is not scientifically legitimate to remove placebo run-in events from the calculation while leaving in Paxil events from other non-randomized phases such as uncontrolled trials and open label extensions.  This would be an 'apples to oranges' comparison."  (d/e 45, p. 11-13).

Defendant's supplemental response also maintains that the differences in results set forth in the requests admissions are not statistically significant. *Id.*

Plaintiffs object to Defendant "add[ing] irrelevant factors to confuse the un-indoctrinated" and then counter Defendant's assertion with their own

---

[11]For example, RFA 126 states, "With placebo run in suicide attempts excluded from GSK's April 29, 1991 document, placebo's suicide attempt occurrence per patient exposure year would have been "0.014."

argument about what data should be included in the calculations, how the calculations should be made, and what the results mean.  Yet the purpose of requests for admissions is to simply to identify what the parties do and do not dispute.  Whether the disputes identified by the parties actually present genuine issues of material fact is a question for the Court on summary judgment.

## CONCLUSION

In sum, though Plaintiffs are not satisfied with Defendant's responses to the interrogatories and requests for admission, those responses satisfy the requirements of the Federal Rules.   The Court apologizes for any delay in ruling on this motion.  The motion, response, and reply required substantial time for analysis and ruling.

IT IS THEREFORE ORDERED THAT Plaintiffs' Motion to Compel and for Sanctions is DENIED (d/e 39).

ENTER:    March 12, 2007

s/ Byron G. Cudmore

_____

BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE