IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | |
|---|---|
| Bonnie J. Mason and,<br>William J. Mason,<br>Individually and as Co-Administrators<br>of the Estate of Tricia M. Mason,<br>Deceased,<br><br>      Plaintiffs,<br><br>v.<br><br>Smithkline Beecham Corporation,<br>d/b/a/ Glaxosmithkline, a Pennsylvania<br>Corporation,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No.  05-CV-1252<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Before the Court is Defendant's corrected Motion to Strike Plaintiffs' Untimely Supplemental Expert Report (d/e 55).[1]  For the reasons below, the Court grants the motion in part and denies the motion in part.

### LEGAL STANDARD

Fed. R. Civ. P. 26(a)(2) requires a party to disclose the identity of persons who may be called to testify as experts, along with a detailed

---

[1]On March 12, 2007, the Court granted the parties' joint request to stay deadlines, mooting Defendant's request to stay deadlines in the motion # 55.  (d/e 66 and 3/12/07 text order).

written report, signed by the expert, containing:

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered . . ; any exhibits to be used as a summary of or support for the opinion . . .

Fed. R. Civ. P. 26(a)(2)(B). Rule 26(a) expert reports cannot be "sketchy, vague or preliminary in nature." Salgado v. General Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir. 1998)(also recognizing that report must include "all exhibits to be used as a summary of or support for the opinions"); Federal Rule of Civil Procedure 26(a)(2) Advisory Committee Notes, 1993 Amendments ("The report is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinion."). "Disclosure must not be used as a means to extend a discovery deadline." Salgado, 150 F.3d at n. 6.

Expert disclosures must be supplemented "when required under subdivision [26] (e)(1)." Rule 26(e) requires disclosures to be "supplement[ed] or correct[ed] . . . to include information thereafter acquired if:

> the party learns that in some material respect the information disclosed is incomplete or incorrect . . . With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a

>deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's [pretrial disclosures] are due.

Fed. R. Civ. P. 26(e)(1); Federal Rule of Civil Procedure 26(a)(e) Advisory Committee Notes, 1993 Amendments ("changes in the opinions expressed by the expert whether in the report or at a subsequent deposition are subject to a duty of supplemental disclosure . . .").

Fed. R. Civ. P. 37(c)(1) applies when a party has failed to meet its disclosure duties:

>A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure . . .

"The sanction of exclusion is 'automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.'" Nutrasweet Co. v. X-L Engineering Co., 227 F.3d 776, 785-86 (7th Cir. 2000)(quoted cite omitted); Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000)(party's failure under Rule 26(a) must be both unjustified and harmful).

The District Court's decision is reviewed for abuse of discretion, but the Court is mindful that, "[d]epriving the parties of a merits disposition is serious business." Salgado, 150 F.3d at 740; Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000). Rule 37(c)(1) sanctions "must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction." Salgado, 150 F.3d at 740.

## BACKGROUND

Dr. Glenmullen's first expert report was timely produced on October 5, 2006 (the "first report"), the deadline established by the Court's September 5, 2006, agreed, amended scheduling order (d/e 36). The deadline for deposing Dr. Glenmullen was extended to January 12, 2007, pursuant to the Court's second amended scheduling order, also requested and agreed to by the parties. (d/e 44, 11/15/06 order). The third amended, agreed scheduling order extended Dr. Glenmullen's deposition deadline to February 9, 2007, as well as extending other deadlines. (d/e 51, 1/16/07 order). The joint motion asking for the extension of Dr. Glenmullen's deposition deadline stated:

> "Because of information not available at the time of Dr. Glenmullen's October 5, 2006 report, counsel for Plaintiffs has notified counsel for Defendant that Dr. Glenmullen will be supplementing his report. In the interest of conserving

resources and to avoid multiple depositions, the parties agreed to reschedule Dr. Glenmullen's deposition for a time no later than February 9, 2007." (d/e 50).

Dr. Glenmullen's authored another expert report on January 15, 2007 (the "second report"). Defendant moved to strike the second report on February 6, 2007, and filed a corrected motion to strike the next day, which is the motion now before the court. (d/e 55). Dr. Glenmullen's first report is docketed in its entirety as #59 (initially under seal and then unsealed). His second report is docketed in its entirety as #60, portions of which remain under seal.

ANALYSIS

I.   Except as specified herein, the Court concludes that Dr. Glenmullen's second report should be stricken.

Dr. Glenmullen's second report declares, "You recently forwarded voluminous internal GlaxoSmithKline documents produced during discovery. The documents provide strong support for the opinions expressed in my original report." (d/e 60, p.1). Yet Dr. Glenmullen does not give any specifics about what internal documents he received after his first report. Similarly, Plaintiffs contend that "Dr. Glenmullen obtained new information on the subject of Paxil's ability to induce suicidality, conducted further analysis of the issues, and developed more extensive opinions

about Paxil-induced suicide that are highly relevant to this case." (d/e 57, p.3).  However, Plaintiffs also do not specifically identify what new information became available to Dr. Glenmullen after his first report, except for the matters discussed in section III below.

After careful review of both reports and the record in this case, the Court concludes that the second report is based largely on information available to and in the possession of Dr. Glenmullen before he authored his first report.  The Court arrives at this conclusion because 1) many of the cites in the second report refer to documents also cited in the first report, including several internal GSK documents; 2) several of the documents which the second report discusses were also the subject of Plaintiffs' interrogatories and requests to admit sent to Defendant before fact discovery closed on September 1, 2006 (*see* Plaintiffs' memorandum in support of motion to compel, d/e 40, and attached Appendix of Discovery Responses); and, 3) several portions of the second report recount events that have been of public record for years.  The Court explains its reasoning in more detail below.

    A.  <u>Part 1 of the Second Report</u>

Part 1 of the second report gives an in-depth critique of GSK's statistical presentation of its Paxil Data over the years.  For example, the

second report sets forth information GSK provided in its 1989 New Drug Application ("NDA").  (d/e 60, pp. 2-7).  After setting forth GSK's data, Dr. Glenmullen explains why the numbers are "bad," i.e., statistically unsound and misrepresentative of the truth of Paxil's safety and efficacy.  He then offers his own tables to demonstrate what the data shown correctly demonstrate.  He asserts that, done correctly, the Paxil Data submitted in 1989 show an eight-fold increase in risk of suicidal behavior in patients on Paxil.  (d/e 60, p. 7).

As with the 1989 data, the second report goes down similar roads for the data GSK presented to the FDA and in various public forums and publications in 1991, 1994, 1995, 1999, and 2002.  (d/e 60, 9-39).  The second report also recounts and critiques FDA hearings, transcripts, tables, reports and warnings spanning from December 2006 back to 1989.  The first report does contain some of the same opinions as the second report, though not in the same detail.[2]

It appears that nearly all the information relied on in the second report was available to and in the possession of Dr. Glenmullen when he

---

[2] For example, in his first report Dr. Glenmullen stated that GSK skewed results in its 1989 submission to the FDA and its 1991 re-analysis of data, due to improperly including placebo run-ins and improperly hiding suicide events under the label "emotional lability".  (d/e 59, p. 10).

filed his first report. A search of the references cited in both reports reveals the documents relied on are largely identical, the only difference being the cite itself, not the document to which the cite refers. For example, the appendices in both reports reference the same GSK data from 1989, 1991, 1994, 1995, and 2002, as well as the FDA hearings, transcripts, tables, reports and warnings. *See, e.g.,* Appendix C to the first report, d/e 59, "Paxil Documents," Vols. 1 and 2.[3] Plaintiffs own discovery requests as set forth in their motion to compel also allude to many of these same documents and assail GSK's "bad" numbers. (d/e 39).

Plaintiffs have not adequately explained why Part I was not included in the first report (except for the portions discussed in section III below).

---

[3]A few more examples: footnote 47 of the second report (referencing Dr. Donnelly's internal memo after the 1991 hearing), refers the reader to "App. A. Binder 3, Paxil Adult Suicide Vol. 1, Tab 3, Doc. 3". Traveling to that cite, the reader is then referred to a list of documents that, upon some searching, are identical to the documents listed in the first report but under a different cite, "App. C, Paxil Adult Suicide, Vol. 1, tab 3" (d/e 59). The same result occurs when one pursues footnote 59 in the second report, which ultimately refers to "SKB Marketing Department memorandum regarding met analysis examining suicidal ideation–approved for use--July 5, 1995," the identical document referred to in the first report at App. C, Paxil Docs., Vol. 2, tab 6. When one searches for the second report's cite to an internal GSK e-mail (footnote 62, second report), it turns out to be the same e-mail cited in the first report at App. C. , "Death Letter," p. I, tab 10. Similarly, the record of conversations in 2002 between Thomas Laughren and GSK's David Wheadon are cited in both reports, as are various drafts of GSK documents. *See*, second report, pp. 35-37 and App. C. Paxil Docs., Vol. II, tab 8, in first report; also compare p. 14 of the second report, which ultimately refers to the identical documents cited in the first report under Appendix C, Paxil Docs., Vol. 1, tab 4.

They have therefore not shown that its omission from the first report was justified. See Collier v. Bradley Univ., 113 F.Supp.2d 1235, 1243 (7th Cir. 2000)(Judge Mihm)(granting motion to strike "supplemental" expert report where report was belated attempt to add new theories and plaintiff failed to explain why the information had not been provided in original report).

Nor is the Court persuaded that Part I of the Second Report is harmless. Part 1 of the second report is over 50 pages and represents the bulk of Dr. Glenmullen's opinions detailing and demonstrating the reasons why GSK's compilation, analysis and presentation of its data was misleading. With the exception of the material discussed in section III below, Part I could have and should have been included in the first report. Timely disclosure would have allowed Defendant to properly prepare for and take Dr. Glenmullen's deposition. Instead, Defendant was detoured on the instant motion to strike. That the trial was scheduled for September does not render the untimely disclosure harmless.

Additionally, portions of Dr. Glenmullen's remarks in Part I of his second report do not appear to be expert opinion, but instead attempts to

introduce irrelevant and/or prejudicial information and argument,[4] or are attempts to establish facts of which Dr. Glenmullen has no "expert" or personal knowledge.[5]  These sorts of comments are also not harmless because they place significant culling burden on both Defendant and the Court.

---

[4]For example:
" . . .in 1990 startling news broke that Prozac was making patients suicidal . . . sensational cases in the media including the suicide of . . . Joe Wesbecker . . . who killed twelve people and wounded eight others before taking his life."  (d/e 60, p. 8)

"In 2003, when the issue of Paxil-induced suicidality exploded in the media . . . the New York Times interviewed members of the FDA's 1991 advisory committee who said they would have voted for the warning back in 1991 had the data been available to them." (d/e 60, p. 21).

"On June 6, 2001, a Wyoming Jury Awards 6.4 Million in a Paxil-Induced Murder Suicide . . . The case involved a sixty-year-old man . . . who shortly after starting Paxil killed his beloved wife . . . daughter . . . and granddaugther . . . before committing suicide."  (d/e 60, 33-34).  Also recounted is a class action lawsuit filed in 2001, and New York's Attorney General Eliot Spitzer suing GSK for fraud in 2004.  (d/e 60, p. 41).

"In 2002-2003 the BBC runs a pair of Hard-Hitting Exposés on Paxil-Induced Suicide and Suicide Attempts" (d/e 60, p. 39).  Also discussed is how the British "virtually banned" Paxil for children and adolescents in 2003 and put pressure on the FDA.

[5]At times Dr. Glenmullen quotes portions of FDA transcripts, memos or other documents that speak for themselves, drawing his own layman's inferences about the knowledge and motive of FDA employees. For example: "Dr. Brecher [of the FDA] had no way of knowing that GSK's per patient exposure years calculations were inappropriate."  (d/e 60, p. 18).  "Responding to public and professional fear, . . . the FDA held a day-long hearing . . ." Id.  See also (d/e 60, pp. 21, 36)(under seal).

B. <u>Part II of the Second Report</u>

Part II of the second report (d/e 60, pp. 53-59) details how GSK ran its studies, including how adverse events were internally rated and reported by GSK researchers. About 20 patients are identified by number, along with their reported events and the researchers' recorded judgments. (d/e 60, p. 55).

The Court is not sure what the point is of Part II in relation to Dr. Glenmullen's expert opinion on GSK's "bad" numbers or the cause of death. In any event, it appears to the Court that the information relied on in Part II was all available for the first report. *See* First Report, d/e 59, App. C. Paxil SAE Documents, pp. i-v. Plaintiffs do not assert otherwise, nor do they explain why Part II was not included in the first report. Therefore, Plaintiffs have not justified the omission of Part II from the first report. Nor is the omission harmless, for the reasons discussed in Part I above.

II. <u>Part III of the Report is Harmless and Should not Be Stricken</u>

Part III of the second report (d/e 60, pp. 60-65) summarizes 17 publications on "SSRI-induced suicidality" and is titled "Published Medical Literature on Anti-Depressant Induced Suicidality and Self Harm." As with Parts I and II, it appears the articles summarized were either included as references in the first report (d/e 59, index to Paxil Suicide Medical

Literature), or pre-date the first report, with the exception of an announcement by the National Institute of Mental Health in November 2006 about its new research projects into the area.  As with the other Parts, Plaintiffs have not explained, and have therefore not justified, this addition.

However, the Court views Part III as largely harmless because Dr. Glenmullen already opined in his first report that studies have shown "antidepressants trigger[] suicide" and discussed specific studies that support that conclusion, along with a detailed appendix that lists some of the same studies listed in Part III (d/e 59, pp. 2, 11, Appendices A and B). In the Court's view, Part III adds little new to Dr. Glenmullen's opinion that antidepressants can cause suicide, and its addition will not unduly burden Defendant.

III.   <u>Pages 43-51 (of Part I) of the second report should not be stricken because the disclosures are arguably proper under Rule 26(e) and/or justified under Rule 37</u>

Plaintiffs contend that "Dr. Glenmullen obtained new information on the subject of Paxil's ability to induce suicidality, conducted further analysis of the issues, and developed more extensive opinions about Paxil-induced suicide that are highly relevant to this case."  (d/e 57, p.3).  However, the only "new" information Plaintiffs specifically identify is information they discovered in another Paxil case in California that remains pending,

*Steinberg v. SmithKline Beecham*. According to Plaintiffs' counsel, the parties have agreed that discovery from *Steinberg* can be used in all cases in which Attorney Coffin is of record. (Coffin Dec., para. 9, d/e 57, attachment #1). Plaintiff's counsel avers:

> 13. It was not until mid-October, 2006, after Dr. Glenmullen's initial report was completed, that Plaintiffs' counsel discovered documents which shed new light on GSK's inclusion of studies 057 and 106 in its previous analyses of suicidality, all of which skewed results in favor of Paxil.
>
> 14. Amongst these documents were slides from a global safety board meeting specifically related to studies 057 and 106, which discussed the implications their exclusion would have on the FDA's adult suicidality analysis.
>
> 15. Critical deposition testimony of a GSK witness, Pamela Barrett, was taken on January 5, 2007. In her testimony, she revealed important details about GSK's analysis of adult suicidality, which preced
>
> 16. On December 13, 2006, the FDA's Psychopharmacologic Drugs Advising Committee held hearings for the antidepressant-induced suicidality issues. These hearings shed new light on GSK's adult Paxil data.

Pages 43 to 48 of the second report detail the basis for Dr. Glenmullen's opinion that including studies 057 and 106 in the statistical analysis was improper because of differences in patient population. Dr. Glenmullen opines in his second report that including studies 057 and 106 "drown[ed] out the relatively small rates in the other studies, obscuring the

differences between Paxil and placebo . . . ." (d/e 60, pp. 43-44).  Pages 49-51 tie those conclusions in with GSK and FDA actions in May 2006 (some of which are already in the first report), and the FDA hearing in December 2006.

The FDA hearing in December 2006 occurred after Dr. Glenmullen's first report, but it is only a small part of pages 43- 51.  The other information was not available to Dr. Glenmullen, but only because Plaintiffs had not yet found it in the discovery produced in *Steinberg*.  The large volume of discovery in a different case is not persuasive justification for late expert disclosures in this case.  If it were, this case could be delayed indefinitely as expert reports are continually supplemented based on discovery in *Steinberg*.  If Plaintiffs believed they needed more time to sift through discovery documents in *Steinberg* before disclosing expert reports in this case, they should have asked for an extension in this case.

However, the Court is mindful of the complexity and breadth of this case and does not doubt counsel's averments regarding the large volume of discovery produced in *Steinberg* or its relevance to this case.  The Court

accordingly concludes that the second full paragraph of page 43 through the second full paragraph of page 51 should not be stricken as untimely.

IV.   In addition, the following portions of the second report should not be stricken, as striking them would be disproportionate to the infraction:

-last paragraph, page 1 and concluding on page 2
-last paragraph, page 2 through page 7
-pages 9 through 16
-last paragraph, page 25 through page 28
-page 38, through second full paragraph in page 39
-first paragraph of Conclusion, page 66

As discussed above, the untimeliness of the second report is neither justified nor harmless for the most part.  However, the portions cited above are arguably an important part of Plaintiffs' case.  These portions refer to Dr. Glenmullen's explanations about how GSK's compilation and presentation of it data was misleading in 1989, 1991, 1994, and 2002, and his demonstrations of what the "corrected" (in his view) numbers look like in comparison.[6]  Arguably, these explanations and demonstrations may show in a more concrete way to the trier of fact what was wrong with GSK's numbers.

---

[6]The referenced portions on page 1 and 66 are essentially summaries of those explanations and demonstrations.

Additionally, allowance of these parts does not present much unfair surprise or additional burden to Defendant. Plaintiffs have maintained throughout that GSK used "bad" numbers to mislead about Paxil's safety and efficacy. Though the first report did not include the detailed explanations and demonstrations in the second report, it did criticize GSK for presenting misleading statistics that minimized Paxil-induced suicidality. (d/e 59, p. 8). The first report also discussed the purportedly skewed numbers in GSK's 1989 and 1991 data (d/e 59, p. 10). And, GSK has obviously has had its own data from the beginning. Dr. Glenmullen's explanations and tables in the second report only take that data and demonstrate further the basis for his opinion that GSK used "bad" numbers. Ultimately, the Court believes striking these particular portions would be disproportionate to the infraction. The harm to Defendant by allowing them to stand can be minimized by adjusting the expert discovery deadlines.

IT IS THEREFORE ORDERED THAT Defendant's Corrected Motion to Strike Plaintiffs' Untimely Supplemental Expert Report (d/e 55) is GRANTED in part and DENIED in part.

The motion is DENIED as to the following portions of Dr. Glenmullen's report dated January 15, 2007:

-Part III
-last paragraph, page 1 and concluding on page 2
-last paragraph, page 2 through page 7
-pages 9 through 16
-last paragraph, page 25 through page 28
-page 38, through second full paragraph in page 39
-second full paragraph, page 43 through second full paragraph, page 51
-first paragraph of Conclusion, page 66

The motion is GRANTED with respect to the remainder of Dr. Glenmullen's report dated January 15, 2007.  As the Court cancelled all current deadlines in its Order of March 12, 2007 (d/e 66), the parties are directed to meet and confer and tender proposed supplemental deadlines to the Court by April 11, 2007.

ENTER:   March 26, 2007

s/ Byron G. Cudmore
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE