UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

BONNIE J. MASON, Individually and as )
Co-Administrator of the Estate of Tricia )
M. Mason, Deceased, and WILLIAM L. )
MASON, Individually and as Co- )
Administrator of the Estate of Tricia M. )
Mason, Deceased, )
  )
              Plaintiffs, )
  )
    v. )    Case No. 05-1252
  )
SMITHKLINE BEECHAM CORP. D/B/A )
GLAXOSMITHKLINE, a Pennsylvania )
Corporation, )
             Defendant. )

## O R D E R

This matter is before the Court on Defendant's Motion for Summary Judgment (Federal Preemption), Motion for Summary Judgment (Illinois Law), and the Motion to Exclude the Testimony of Dr. Joseph Glenmullen. For the reasons set forth below, the Motion for Summary Judgment (Federal Preemption) [#86] is GRANTED. As a result, the Motion for Summary Judgment (Illinois Law) [#76] is MOOT, and the Motion to Exclude the Testimony of Dr. Joseph Glenmullen [#77] is MOOT.

### BACKGROUND

Paxil is one of a class of prescription anti-depressants known as selective serotonin re-uptake inhibitors (SSRIs), which operate by controlling the manner in which serotonin is processed by brain cells. Plaintiffs' daughter, Tricia Mason ("Tricia"), was a 23 year-old resident of Normal, Illinois. She began taking Paxil on February 28, 2003.[1] Two days later,

---

[1] The Court notes that the portions of the briefs addressing statements of undisputed and disputed fact that have been submitted by both Plaintiffs and Defendant are so replete with argumentative posturing that they are essentially useless both in determining the basic

on March 2, 2003, Tricia tragically ingested cyanide and committed suicide. Plaintiffs brought this suit against Defendant Smithklein Beecham ("SKB"), the manufacturer of Paxil, alleging that it knowingly failed to warn about the dangerous side effects of the drug, including the risk of self-harm, instead misrepresenting Paxil as a safe and effective treatment for depression. They assert state law claims of negligence, strict liability, breach of implied warranty, breach of express warranty, and fraud in relation to Tricia's death.

SKB has now moved for summary judgment and sought to exclude the testimony of Plaintiff's expert witness. The matter is fully briefed, and this Order follows.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any

---

factual information underlying this case, as well as in resolving the pending motions. The inclusion of 13 and 11 pages of "Introduction" that is reminiscent of closing argument is also wholly inappropriate. Counsel should consider themselves on notice that future filings of this nature will be immediately stricken by the Court.

doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

I.   Federal Preemption

SKB first argues that Plaintiffs' claims are preempted based on proposed warnings that directly conflict with the FDA-approved labeling for Paxil. In support of this Motion, SKB cites Article VI, clause 2 of the U.S. Constitution for the proposition that state law that conflicts with the exercise of federal power is preempted. SKB further relies on the decision in City of New York v. FCC, 486 U.S. 57, 63-64 (1988), to support its assertion that plaintiffs may not pursue claims that "frustrate the purposes" of "statutorily authorized agency regulations."

Plaintiffs respond that there is a presumption "that Congress does not cavalierly pre-empt state-law causes of action." Medtronic v. Lohr, 518 U.S. 470, 485 (1996). Courts

should not find preemption in the absence of "clear evidence of a conflict."  <u>Zikis v. Pfizer, Inc.</u>, 2005 WL 1126090, at *2 (N.D.Ill. 2005).

> The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against preemption.  If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.

<u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. 431, 449 (2005).

Preemption arises from the Supremacy Clause of the United States Constitution, which provides that the Constitution, federal laws, and treaties "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, Cl. 2.  Comity gives rise to a general presumption "that Congress does not cavalierly preempt state-law causes of action." <u>Medtronic</u>, 518 U.S. at 485.

That being said, in <u>Gibbons v. Ogden</u>, 22 U.S. 1, 211 (1824), the Supreme Court interpreted the Supremacy Clause to invalidate any state laws that "interfere with, or are contrary to" the federal law.  Although there are three possible types of preemption, the only possibility at issue here is conflict preemption, which is "applicable when 'state law is nullified to the extent that it actually conflicts with federal law,' even though Congress has not displaced all state law in a given area." <u>Colacicco v. Apotex, Inc. and Smithkline Beecham</u>, ___ F.3d ___, 2008 WL 927848 (3rd Cir. 2008).

The Seventh Circuit has not yet addressed the precise question of whether state law claims are preempted in the context of a suicide by a patient taking Paxil, and neither side has cited to closely analogous Seventh Circuit precedent.  In fact, it would appear that this issue has not been addressed extensively on the appellate level, as the cases relied on are

largely from district courts outside of this circuit.[2] However, the Third Circuit recently issued its decision in Colacicco, which is the first case to address this question at the circuit level.

In Colacicco, plaintiffs were the surviving relatives of decedents who had committed suicide after taking the antidepressants Paxil and Zoloft. Id., at *1-2. The appeal directly presented the questions of whether the plaintiffs could maintain their state law causes of action alleging that the drugs' labeling failed to warn of their association with an increased risk of suicidality and whether actions taken by the Food and Drug Administration ("FDA") and its corresponding regulatory scheme preempt the plaintiffs' state law failure to warn claims.

The Third Circuit examined whether there is an applicable presumption against preemption, noting Medtronic's discussion of a presumption against preemption cited by Plaintiffs above. The court recognized that "[a]lthough a presumption against preemption is commonly acknowledged, the Supreme Court has made clear that the application of such a presumption is not always appropriate." Colacicco, 2008 WL 927848, at *6, *citing* Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347-48 (2001) (declining to apply a presumption against preemption where the plaintiff alleged fraud on the FDA.) Where the relationship between the federal regulatory agency and the entity that it regulates "originates from, is governed by, and terminates according to federal law," the Supreme Court found that traditional state interests in public health and safety were not implicated and declined to apply any presumption against preemption. Id., at *7. The same is true

---

[2] The most closely analogous case from any court within the Seventh Circuit is Tucker v. Smithkline Beecham Corporation, 2007 WL 2726259 (S.D.Ind. Sept. 19, 2007), which employed an analysis and reached a result similar to that reached by the Third Circuit in Colacicco.

"when the state regulates in an area where there has been a history of significant federal presence." Id., citing United States v. Locke, 529 U.S. 89, 94 (2000).

After acknowledging that the lack of a Congressional directive expressly approving or rejecting preemption in the context of drug labeling regulations was not determinative, the Third Circuit went on to discuss the doctrine of conflict preemption. "A conflict between state and federal law 'arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id., at *9, citing Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985). The court noted the absence of many examples of situations where compliance with both federal and state law was impossible and that most examples of conflicts cases were of the second type discussed in Hillsborough, where the state law imposes an obstacle to the execution of federal objectives. Id., at *9-10. Such obstacles can include litigation based on state tort law. Id., citing Geier v. Am. Honda Motor Co., 529 U.S. 861, 871-72 (2000). Otherwise:

> state law could impose legal duties that would conflict directly with federal regulatory mandates, say, by premising liability upon the presence of the very windshield retention requirements that federal law requires. Insofar as petitioners' argument would permit common-law actions that "actually conflict" with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect.

Id.

In the context of drug labeling requirements, the Third Circuit found that state law failure to warn actions pose particular problems for drug manufacturers. Id., at *11. "State standards of care undoubtedly differ from state to state. Absent a determination that the

- 6 -

FDA-approved labeling and the FDA's refusal to require the warnings suggested by plaintiffs in this case preempt state tort actions, the manufacturers may be subjected to considerable liability based on varying standards, with no benchmark that they should follow." Id.

The Third Circuit reviewed the record of the FDA's treatment of the desired warning at issue, noting first that the FDA is responsible for "'promot[ing] the public health by promptly and efficiently reviewing [drug manufacturers'] clinical research and taking appropriate action on the marketing of regulated products in a timely manner' and 'protect[ing] the public health by ensuring that . . . drugs are safe and effective.'" Id., at *2, *citing* 21 U.S.C. § 393(b)(1) and (b)(2)(B). Drugs may not be marketed without FDA approval. Id., at *11. FDA regulations also require prescription drug labeling, which includes written materials sent to physicians and included with the drug when dispensed to the patient in addition to the label affixed to the prescription bottle itself, to include:

> "[A] summary of the most clinically significant information . . . critical to safe use of the drug," including, inter alia, potential safety hazards associated with use of the drug. 21 C.F.R. § 201.57a(10), (c)(6)(i). Applicants must also include a "summary of the benefits and risks of the drug, including a discussion of why the benefits exceed the risks under the conditions stated in the labeling." Id., § 314.50(d)(5)(viii).

Id., at *3; *see also*, Kordel v. United States, 335 U.S. 345, 350 (1948). Labeling may not be false or misleading. Id., at *11, *citing* 21 U.S.C. § 355(d)(7).

Regulations govern the FDA's oversight of drug labeling even after a drug has been approved for distribution. Id., at *3. The general requirements for the content and format of drug labeling are described at 21 C.F.R. § 201.56, while the specific requirements for such labeling can be found at 21 C.F.R. § 201.57. Id. Manufacturers must include a

description of "serious adverse reactions and potential safety hazards" under the heading "Warnings" and labels must be revised "as soon as there is reasonable evidence of an association of a serious hazard with a drug." Id., *citing* 21 C.F.R. § 201.57(e). Problems that may lead to death or serious injury may be required to be placed in a prominently displayed box as directed by the FDA. Id. If a drug is determined to have been "misbranded" by false or misleading labeling, the FDA can withdraw its approval and prosecute the manufacturer. Id., at *11.

Revisions to drug labeling are also covered by FDA regulations. Id., at *3. When any changes are made to an approved drug or its labeling, the manufacturer must notify the FDA. Id. When a change is made to labeling in order "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction," the manufacture must submit a supplement to the FDA at the time it makes the change. Id., *citing* 21 C.F.R. § 314.70(c)(2)(i).

> Drug manufacturers have continuing obligations to report adverse drug experiences, *id.* § 314.80(c), and any "significant new information . . . that might affect the safety, effectiveness, or labeling of the drug product," *id.* § 314.81(b)(2)(i). Failure to abide by these obligations may result in withdrawal of an approved drug. *Id.* §§ 314.80(j), 314.81(d).

Id., at *4.

Like the Plaintiffs here, the plaintiffs in Colacicco argued that conflict preemption would not apply because drug manufacturers are allowed under § 314.70(c) to strengthen and augment warnings without prior FDA approval, rendering the FDA labeling requirements no more than minimum standards. Id., at *12. Accordingly, they contended that common law failure to warn claims requiring a manufacturer to strengthen their warnings would not conflict with the FDA regulations, but rather would be complimentary.

Id.  The Third Circuit rejected this argument, finding that the FDA had repeatedly rejected the scientific basis for the warnings claimed to have been lacking on the labeling.

> The FDA has actively monitored the possible association between SSRIs and suicide for nearly twenty years, and has concluded that the suicide warnings desired by plaintiffs are without scientific basis and would therefore be false and misleading.
>
> In 1991, after considering whether antidepressants caused or intensified suicidal thoughts, the FDA's Psychopharmacological Drugs Advisory Committee concluded that no such warning should be added to Prozac (an SSRI similar to Paxil and Zoloft) or other antidepressants.  The FDA specifically rejected citizen petitions in 1991, 1992, and 1997 which sought to either withdraw approval of Prozac as a result of its asserted association with suicide or to include a suicide warning on the labeling of that drug.  In each instance, the FDA concluded that there was insufficient evidence to take the actions requested.
>
> * * *
>
> The FDA also repeatedly approved the Paxil labeling in effect at the time of Lois Colacicco's prescription of Paxil on October 6, 2003, and her death on October 28, 2003, approving it for a new indication, the treatment of generalized anxiety disorder, just a year before those events. . . .Significantly, on June 19, 2003, the FDA issued a public statement to address reports associating the pediatric use of Paxil with suicidality, in which it stated: "There is no evidence that Paxil is associated with an increased risk of suicidal thinking in adults."
>
> On October 27, 2003, the FDA issued a Public Health Advisory regarding increased suicidality in pediatric users of antidepressants.  This advisory was limited to pediatric patients; a warning for adult patients was not issued.  In that advisory, the FDA announced that it would continue to research the reports of suicidality in pediatric patients treated with antidepressants, explaining that "[s]uch reports are very difficult to interpret, in the absence of a control group, as these events also occur in untreated patients with depression."
>
> Thus, even when it began to reevaluate its position regarding the association of antidepressants with pediatric and adolescent suicidality, the FDA continued to announce its

> rejection of adult suicidality warnings for SSRIs as it had for the decade before the prescriptions and deaths at issue in this litigation. Just months prior to Lois Colacicco's death, the FDA publicly stated that Paxil was not associated with a risk of suicidality in adults.

Id., at *12-13.

With this history in mind, the Third Circuit found that "a federal agency's action taken pursuant to statutorily granted authority may also have preemptive effect over state law." Id., at *14, *citing* Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 327 (1981). Based on the fact that the standard for adding warnings to labels is reasonable evidence of an association of a serious hazard, and the FDA is charged with prohibiting false and misleading labeling, the Third Circuit concluded that "a state-law obligation to include a warning asserting the existence of an association between SSRIs and suicidality directly conflicts with the FDAs oft-repeated conclusion that the evidence did not support such an association." Id. Accordingly, the court held that the plaintiffs' failure-to-warn claims were preempted by the FDA's statutorily authorized actions. Id.

In so holding, the Third Circuit acknowledged that the critical period for scrutiny was the time period before the death at issue. This Court agrees, as liability can only be based on information that existed at the time of the suicide. Woodill v. Parke Davis & Co., 79 Ill.2d 26, 35 (1980). The record is simply devoid of any FDA finding of increased risk of suicidality in any patient group prior to Tricia Mason's death in March 2003.

Even if the time period following the death was to be considered, the same result would follow. As set forth previously in this Order, it was not until October 27, 2003, more than six months after Tricia Mason's death, that the FDA approved a warning limited to pediatric patients; no corresponding warning was issued for adult patients like Tricia

Mason. Colacicco, 2008 WL 927848, at *13. In spring 2004, the FDA directed the SSRI manufacturers to include stronger warnings about the need to watch patients for worsening depression or suicidality, but expressly noted that it had "not concluded that these drugs cause worsening depression or suicidality in adult patients" like Tricia Mason. Id., at *15. In October 2004, the FDA directed manufacturers of SSRIs to add a warning about an association between antidepressants and suicide in adolescents under the age of 18; the warning did not extend to adults or even young adults like Tricia Mason. It was not until May 2007, more than three years after Tricia Mason's suicide, that the FDA directed that warnings be included to indicate that antidepressants can increase the risk of suicidality in children, adolescents, and young adults[3]; even then, the FDA "reaffirmed its conclusion that there is insufficient evidence demonstrating that SSRIs are associated with adult suicidality" and required language indicating that a link between taking the prescribed SSRIs and the emergence of suicidal impulses had not been established. Id., at *16.

Based on guidance from the Supreme Court's recent holding in Geier, the Third Circuit considered the agency's position as one factor in reaching its conclusion.

> [I]n Geier the Supreme Court recently addressed the weight to be given to an agency's position on preemption. The Court "place[d] some weight" on a Department of Transportation interpretation, as set forth in an amicus brief, of a rule that it had promulgated. The Court considered that Congress had delegated the agency "authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive." The Court stated that the agency was "uniquely qualified to comprehend the likely impact of state requirements." The Court also noted the consistency of the agency's position over time, and the coherence of the agency's views.

---

[3] Young adults, as defined by the FDA to include individuals between the ages of 18 and 24, would include Tricia Mason, who was 23 at the time of her death.

Id. (internal citations omitted) The Court further noted that conflict preemption did not require "a specific expression of agency intent to preempt, made after notice-and-comment rulemaking." Id., *citing* Geier, 529 U.S. 883-85.

The degree of deference to be attributed to the agency's position depends on the extent of the agency's care, consistency, formality, relative expertise, and the persuasiveness of its position. Id., at *17, *citing* United States v. Mead Corp., 533 U.S. 218, 228 (2001). Guided by this standard, as well as the Supreme Court's decision in Geier, the Third Circuit recognized express statements by the FDA in the preamble to the 2006 amendments to the drug labeling regulations and an amicus brief filed in the Colacicco case indicating the FDA's belief that such claims should be preempted. Id. "The preamble specifically states that preemption applies to 'claims that a [manufacturer] breached an obligation to warn by failing to include a statement in labeling or in advertising, the substance of which had been proposed to FDA for inclusion in labeling, if that statement was not required by FDA at the time plaintiff claims the [manufacturer] had an obligation to warn.'" Id., *citing* 71 Fed.Reg. 3922, 3926 (Jan. 24, 2006). Furthermore, the FDA has clarified that "the basis for federal preemption is not the [labeling] guidelines themselves . . . , but rather FDA's repeated determinations prior to October 2003 that there was insufficient scientific evidence of an association between adult use of SSRI and suicide or suicidality to permit a warning on the labeling for those drugs . . . ." Id.

The court then considered the FDA's rational for its position, which involves considerations of effectiveness and interference. The FDA took the position that unnecessary warnings could actually dissuade doctors from prescribing SSRIs to patients for whom the treatment could be potentially lifesaving and that the distraction created by

the inclusion of unsubstantiated warnings could reduce the effectiveness of valid warnings and possibly even interfere with the valid warnings being read.  Id.  The FDA opined that the imposition of liability in tort based on the failure to warn of the potential for increased suicidality would interfere with its ability to accomplish its regulatory objectives.  Id.  With this in mind, the Third Circuit concluded that the FDA's position on the issue presented in Colacicco had the "power to persuade" and was entitled to some degree of deference in the balance of its consideration.  Id.

The holding in Colacicco was limited to circumstances in which the FDA had publicly rejected the need for the warnings claimed to be required under common law tort theories. Id., at *14.  However, that is precisely the case now before this Court, where Plaintiffs allege that GSK failed to warn patients, providers, and the public of the increased risk of self-harm or suicidality that they claim was associated with Paxil.

The question presented in this case involves a delicate balance between the important interest in providing safe, effective treatment for patients suffering from depression and the equally important interest in protecting these same patients from the significant risk that they could suffer dangerous side effects.  With all due respect to the Plaintiffs, the Court finds the Third Circuit's thorough analysis in Colacicco to be both persuasive and compelling, such that the Court believes that the Seventh Circuit would reach the same conclusion when presented with the same issue.

Here, Plaintiffs' state law tort claims derive from the basic claim that the labeling and corresponding written information distributed to patients and doctors for Paxil in 2003 was false, misleading, or even fraudulent because it lacked warnings regarding the risk of increased suicidality or self-harm that had been consistently and expressly rejected by the

FDA as scientifically unsubstantiated. While the Court would not likely reach the same conclusion if presented with a case seeking a finding of conflict preemption based solely on the FDA's rules and regulations, the Court has been persuaded that this situation, where the FDA had consistently considered and rejected the very warning now claimed to have been lacking, merits a different result.[4] Any other outcome would present an actual and direct conflict: GSK would have been forced to choose between complying with federal law but being exposed to substantial liability from state tort law claims, or adding the suggested warning despite the lack of reasonable evidence to protect against state tort law claims but exposing itself to federal liability, including the possibility that the FDA would withdraw its regulatory approval of Paxil for false or misleading labeling. This conflict would impose an obstacle to the FDA's legitimate regulatory objectives by basing tort liability on the absence of a warning that the FDA has effectively determined would be false or misleading. Accordingly, for the reasons set forth in Colacicco and this Order, the Court finds that Plaintiffs state law tort claims are preempted by the FDA's actions taken in accordance with its statutory authority. Plaintiffs are therefore barred from proceeding with this action.[5]

---

[4] This distinction addresses Plaintiffs' complaint that the FDA has made inconsistent statements regarding its intent to preempt state law, as those comments were addressed toward the question of the preemptive effect of the FDA's regulations and labeling requirements in and of themselves, which is readily distinguishable from the situation where a specific warning has been considered and expressly rejected.

[5] To the extent that any of Plaintiffs' claims suggest that GSK withheld facts or studies from the FDA during the continuing course of its review of Paxil and other SSRIs, the claim would best be construed as something akin to claiming fraud on the FDA. In Buckman v. Plaintiffs' Legal Comm., 531 U.S. 341, 348 (2001), the Supreme Court held that such claims would also be preempted.

The Court is not unsympathetic to the Plaintiffs' tragic loss. Losing their daughter at such a young age must have been almost unbearable. The Court is also cognizant of the fact that the conclusion that the state law claims presented in this case are preempted effectively leaves Plaintiffs with no legal remedy for Tricia's death. However, not all tragedies have legal remedies, and the Court cannot ignore the law in order to achieve a more compassionate result.

II.     State Law and Dr. Glenmullen

Based on the Court's finding that this entire action is preempted by the doctrine of conflict preemption given the FDA's actions taken in accordance with its statutory authority, the Court need not resolve the arguments presented in the Motion for Summary Judgment (Illinois Law) and Motion to Exclude the Testimony of Dr. Joseph Glenmullen are they are therefore moot.

## CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment (Federal Preemption) [#86] is GRANTED. The Motion for Summary Judgment (Illinois Law) [#76] is MOOT, and the Motion to Exclude the Testimony of Dr. Joseph Glenmullen [#77] is MOOT. Any other pending motions are MOOT, and all existing deadlines are VACATED. This matter is now terminated.

ENTERED this 23rd day of April, 2008.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge