**E-FILED**
Wednesday, 07 July, 2010 08:50:35 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BONNIE J. MASON, individually and as<br>a co-administrator of the estate of TRICIA<br>M. MASON, deceased, and WILLIAM L.<br>MASON, individually and as co-administrator<br>of the estate of TRICIA M. MASON, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>SMITHKLINE BEECHAM CORP. d/b/a<br>GLAXOSMITHKLINE, a Pennsylvania<br>corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 05-1252 |

## ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. For the reasons set forth below, the Motion for Summary Judgment [#76] is DENIED IN PART and GRANTED IN PART.

## JURISDICTION

This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

## BACKGROUND

This is a wrongful death case brought by Plaintiffs, the parents of the deceased and co-administrators of her estate, against Defendant Smithkline Beecham Corporation, d/b/a/ Glaxosmithkline ("GSK"), the manufacturer and distributor of the antidepressant drug Paxil. Plaintiffs allege that Paxil caused their daughter, Tricia Mason ("Tricia"), to commit suicide, and

that GSK failed to adequately warn prescribing physicians and patients of the risk that Paxil can increase the chances of suicidal behavior in patients suffering from depression and other psychiatric disorders.

Defendant GSK manufactures and distributes Paxil, an antidepressant commonly classified as a selective serotonin reuptake inhibitor ("SSRI"). (Defendant's Memorandum in Support of Summary Judgment at 2.) The drug was originally approved by the Food and Drug Administration ("FDA") as safe and effective for treating a variety of psychiatric disorders, including depression. Id. GSK included the following warning to prescribing physicians in the 2003 Package Insert for Paxil and in the Physician's Desk Reference ("PDR"):

> PRECAUTIONS: Suicide. The possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Paxil (paroxetine hydrochloride) should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose. Because of well established comorbidity between major depressive disorders and other psychiatric disorders, the same precautions observed when treating patients with major depressive disorder should be observed when treating patients with other psychiatric disorders. (Def. Br. 3.)

On February 27, 2003, Tricia visited Nurse Practitioner Robin Schertz[1] ("Nurse Schertz") at the Carle Clinic in Bloomington, Illinois. (Plaintiff's Memorandum in Opposition to Summary Judgment at 4.) During the visit, Tricia told Nurse Schertz that she had been feeling depressed and that her family had a history of depression; specifically, her mother was taking an antidepressant and had attempted suicide. Id. Nurse Schertz asked if Tricia had any suicidal thoughts or ideation, which she denied. Id. She then diagnosed Tricia with depression, prescribed Paxil 12.5 mg, and gave her two sample packs of the medication. Id. Two days later, on March 2, 2003, Tricia committed suicide by ingesting cyanide. Id. She was 23 years old at the time. (Nurse Schertz Deposition, 41.)

---

[1] Nurse Schertz is licensed to practice medicine and prescribe medications in the State of Illinois.

Some evidence indicates that Tricia had suicidal thoughts prior to taking Paxil.  Two of Tricia's friends, Danny Dones ("Dones") and Jason Pemberton ("Pemberton"), stated in depositions that Tricia had confided her suicidal thoughts with them on two different occasions. Dones testified that two months prior to taking Paxil, Tricia told him she was feeling depressed and "had mixed some chemicals together and was keeping them so that she could drink them and commit suicide" (Dones Dep., Defendant's Exhibit B at 39).  He believed he talked her out of it, however, since she promised to pour out the mixture and speak with a therapist.  Id.  Pemberton testified that around Valentine's Day, two weeks before taking Paxil, Tricia had told him she had "contemplated" committing suicide.  He believed that she was "down and lonely and depressed" and that if he could get her talking with her friends, she would get "out of the rut" (Pemberton Dep., Def.'s Ex. C, 38-39).  Unlike her conversation with Dones, Tricia did not mention a method of how she might commit suicide that time.  Id. at 38.  Dr. Joseph Glenmullen, Plaintiff's designated expert witness, opined in his deposition that Tricia's statements to Dones and Pemberton were probably not serious statements, but cries for attention (Dr. Glenmullen Dep., Pl.'s Ex. 2, 291-292).

In May 2006, three years after Tricia's suicide, GSK changed the information provided in the "Warnings" section of the Package Insert and PDR to the following:

> Young adults, especially those with MDD [Major Depressive Disorder], may be at increased risk for suicidal behavior during treatment with paroxetine.  An analysis of placebo-controlled trials of adults with psychiatric disorders showed a higher frequency of suicidal behavior in young adults (prospectively defined as aged 18-24 years) treated with paroxetine compared with placebo (17/776) [2.19%] versus 5/542 [0.92%], although this difference was not statistically significant.  In the older age groups (aged 25-64), no such increase was observed. In adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behavior patients treated with paroxetine compared with placebo (11/3,455) [0.32%] versus 1/1,978 [0.05%]; all of the events were suicide attempts.  However, the majority of these attempts for paroxetine (8 of 11) were

3

in younger adults aged 18-30 years.  These MDD data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24.  (Def. Mem. Supp. Summ. J. 5.)

Also in May 2006, GSK released a "Dear Healthcare Professional" letter that drew attention to the changes in the "Warnings" section for Paxil.  (Pl.'s Ex. A to Donald J. Farber Declaration.)  In pertinent part, the letter stated that there was a "higher frequency of suicidal behavior in young adults (prospectively defined as age 18-24)," but that the finding "was not statistically significant."  It also noted that for patients of all ages with Major Depressive Disorder, the difference was "statistically significant; however, as the absolute number and incidence of events are small, these data should be interpreted with caution."  The group with the greatest increase in suicidal activity was MDD patients between the ages of 18-30.  The letter concluded by stating that it was "difficult to conclude a causal relationship between paroxetine and suicidality due to the small incidence and absolute number of events, the retrospective nature of this meta-analysis, and potential for confounding by the fact that the events of interest are a symptom of the psychiatric illnesses themselves."

Prior to prescribing Paxil, Nurse Schertz does not remember whether she had read the warnings contained in the 2003 Package Insert or PDR (Nurse Schertz dep., 88, 90), but she testified that it was her "custom and practice" to inform herself about the risks of medications by reading PDRs and package inserts, id. at 20.  She also testified that she would have provided the 2006 warning about the increased suicide risk for young adults to Tricia prior to prescribing Paxil.  Id. at 44-46.  She stated that if she knew that Paxil would worsen Tricia's symptoms of depression and increase her risk for having suicidal behavior, she would not have prescribed Paxil.  Id. at 74-75.  At another point in the testimony, however, she stated she would still have

4

prescribed the drug if she knew of the information from the 2006 warnings and "Dear Healthcare Provider" letter because Tricia denied ever having suicidal thoughts.  Id. at 58, 62.

## PROCEDURAL HISTORY

On August 31, 2005, Plaintiffs initiated this action against GSK, alleging that Paxil caused Tricia's death and that GSK failed to issue an adequate warning label because it "did not warn about the association with and risk of akathisia, did not warn about the risk of psychosis, and did not warn that Paxil is associated with acts of violence and/or self-harm."  (Complaint at 6.)  They allege that GSK was aware of the connection as early as February 1990 – thirteen years before Tricia committed suicide – but failed to include that risk in the warnings until 2006.  Id. at 5-6.

Plaintiffs set forth five alternative theories of liability under Illinois law in the complaint. First, they claim that GSK did not act as a "reasonably prudent drug manufacturer" because it failed to provide adequate warning labels to Paxil users and healthcare providers about the "dangers, risks and side effects associated with the taking of [sic] the prescription medication Paxil."  Id. at 7-8.  Second, they allege that GSK is strictly liable for damages because the inadequate warning rendered Paxil defective and unreasonably dangerous.  Id. at 8-10.  Third, they allege that GSK breached the implied warranties of merchantability and fitness for a particular purpose.  Id. at 10-11.  Fourth, they allege that GSK breached an express warranty.  Id. at 11-12.  Fifth, they allege that GSK fraudulently concealed known suicide risks from healthcare providers, patients, and the general public.  Id. at 12-17.  In their prayer for relief, Plaintiffs request compensatory and punitive damages.  Id. at 17.

On October 2, 2007, GSK filed two separate motions for summary judgment:  one on the grounds that Plaintiffs' claims were preempted by the Supremacy Clause of the United States

Constitution, and one on the grounds that it was entitled to a judgment in its favor as a matter of law on the state law claims.  On April 28, 2008, this Court granted summary judgment for GSK on the Federal Preemption claim.  Mason v. Smithkline Beecham Corp., 546 F.Supp.2d 618, 627 (C.D.Ill. 2008).  The Seventh Circuit reversed that decision and remanded the case for consideration of the Plaintiffs' state law claims.  Mason v. Smithkline Beecham Corp., 596 F.3d 387, 396 (7th Cir. 2010).  Plaintiffs have responded to GSK's motion on the Illinois law claims, and GSK has replied to their response.  The matter is now fully briefed, and this Order follows.

## SUMMARY JUDGMENT STANDARD

This Court will grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Spath v. Hayes Wheels Int'l-Ind., Inc., 211 F.3d 392, 396 (7th Cir. 2000).

"Neither the mere existence of some alleged factual dispute between the parties nor the demonstration of some metaphysical doubt as to the material facts will sufficiently demonstrate a genuine issue of material fact."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."  Anderson, 477 U.S. at 252, 106 S.Ct. 2505; Insolia v. Philip Morris, Inc., 216 F.3d 596 (7th Cir. 2000).

For the purposes of summary judgment, this Court views all facts in the light most favorable to the nonmoving party, and draws all reasonable inferences in favor of that party.  See Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Spath, 211 F.3d at 396.

## DISCUSSION

GSK seeks summary judgment on all five of Plaintiffs' theories of liability on the grounds that Plaintiffs have no evidence that either Paxil itself or the potentially inadequate 2003 warnings caused Tricia to commit suicide.  Specifically, GSK argues that (1) Plaintiffs' claims are barred by the "learned intermediary" doctrine; (2) Plaintiffs have failed to present specific evidence that Paxil and its inadequate warning were the proximate causes of Tricia's death; (3) Plaintiffs have no evidence that an express warranty was made[2]; and (4) punitive damages are unavailable.  Each issue is dealt with in turn.

*Learned Intermediary Doctrine*

In fail-to-warn cases such as this, the plaintiff has the burden of establishing:  (1) the defendant had a duty to warn; (2) the defendant knew or should have known the drug could cause the plaintiff's injury; (3) failure to provide the necessary information made the warning inadequate; (4) this defect was the proximate cause of the plaintiff's injuries.  See N. Trust Co. v. Upjohn Co., 572 N.E.2d 1030, 1037 (1991).

In Illinois pharmaceutical cases, a drug manufacturer's duty to warn is modified by the "learned intermediary" doctrine.  See Kirk v. Michael Reese Hosp. & Med. Ctr., 513 N.E.2d 387, 393 (Ill. 1987).  Under this doctrine, a drug manufacturer's duty to provide adequate warnings of

---

[2] In their memorandum, Plaintiffs "specifically did not address arguments relating to claims for express warranty." (Pl.'s Mem. Opp. Summ. J. 17, n. 17.)  If the non-moving party has the burden of proof on an issue, it must affirmatively set forth specific facts that show there is a genuine issue of material facts.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-26, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986).  Having failed to set forth facts on the claim for breach of an express warranty, the Court must enter summary judgment for the defendant on that claim.

risks or side effects through Package Inserts, PDRs, "Dear Healthcare Provider" letters, etc.,

extends only to the physicians. Id.  The physician, in turn, relies on these warnings to decide

which drug to prescribe her patients. Id.  If the warning provided by the manufacturer

adequately explains the risks and side effects of the drug, the product is not unreasonably

dangerous or defective as a matter of law. Id.  Consequently, an adequate warning shields the

manufacturer from liability if the patient suffers from those effects while taking the drug. Id.

If, on the other hand, a warning is inadequate and the risk is not widely-known within the

medical community, the prescribing physician cannot be considered a learned intermediary. See,

e.g., Hansen v. Baxter Healthcare Corp., 764 N.E.2d 35, 43 (Ill. 2002); Procter v. Davis, 682

N.E.2d 1203, 1213 (Ill.App.Ct. 1997); Tongate v. Wyeth Labs, 580 N.E.2d 1220, 1228 (Ill. App.

Ct. 1991).  In that case, a manufacturer is not shielded from liability from the patient's damages.

Whether a prescribing physician is a learned intermediary is normally a question reserved to the

trier of fact, who must determine whether the label was adequate. See N. Trust Co., 572 N.E.2d

at 1037.  Further, "the question of whether [a manufacturer's] knowledge of reported cases of [a

risk] was tantamount to knowledge of an 'association' between the drug and [that risk] which

obligated it to include [the risk] as a possible side effect, [is] a complex question which

require[s] expert testimony." Id.

In its motion for summary judgment, GSK argues that the learned intermediary doctrine

operates as a complete shield for liability, but does not explicitly state that the Paxil warning

label was adequate. [3]  (Def.'s Mem. Supp. Summ. J. 10-11.)  Yet, as stated above, the doctrine

---

[3] Instead, GSK argues that Paxil does not cause an increased risk in suicide in adult patients.  Although this argument appears to be a causation argument (GSK cannot be held liable if Paxil does not cause an increased risk of suicide), it can also be considered an argument that the 2003 warning was adequate.  After all, a warning is only inadequate if it fails to list risks or side effects that do occur.  As will be shown in the "Causation" subsection, however, there is a genuine dispute of material fact as to whether Paxil causes an increased risk of suicide in patients.  Thus, the Court cannot say that the label is adequate as a matter of law.

does not apply in cases where a label is inadequate and where the risk is not widely-known

within the medical community, since a prescribing physician cannot be considered "learned"

about the risks and side effects of a drug if the warning label is silent as to those risks.

Therefore, this Court can only grant summary judgment to GSK if the Plaintiff has no specific

factual basis for alleging that the 2003 warning label was inadequate.

Whether GSK knew of the risk, and whether the risk was great enough to warrant

inclusion on the warning label is a complicated question beyond a lay juror's expertise;

therefore, expert testimony is required to show that the label was inadequate. See N. Trust Co.,

572 N.E.2d at 1037. Plaintiffs offer an expert report from Dr. Glenmullen[4], which concludes

that GSK provided "bad" numbers to the FDA on whether Paxil increased the risk of suicidal

thoughts and attempts. (Pl.'s Ex. 5, p. 17-18). For example, Dr. Glenmullen writes that GSK

deleted from its final draft of its 1991 submission to the FDA that suicidality occurred early in

treatment, rather than being evenly distributed over time. Id. at 18. Yet, the FDA based its

calculations on a metric known as "Patient Exposure Years," which according to Dr. Glenmullen

is only appropriate when a side effect is evenly distributed over time. Id. at 17-18.

Ostensibly relying on such "bad" numbers, the FDA reviewing doctor conceded that "the

instruments available may not be ideal to capture the elusive clinical events [that SSRIs like

Paxil could increase the risk of suicide]," but found "no [statistical] signal in this large data base

that Paxil exposes a subset of depressed patients to additional risk for suicide…." Id. at 18.

However, Dr. Glenmullen points out that "accurate data showed patients on Paxil had a

---

[4] As of now, the parties have stated that this Court need not rule on the admissibility of Dr. Glenmullen's testimony in order to resolve this motion. At the summary judgment stage, where all reasonable assumptions are drawn in favor of the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court will assume that his testimony is allowable. If his testimony is ultimately found to be disallowed following the completion of the briefing process in that regard, the Court will consider a request to revisit this issue.

statistically significant eight-fold increase in suicides and suicide attempts." Id.  In his deposition, Dr. Glenmullen stated that Paxil increased the risk of suicide "more than six-fold" and that "[Tricia] was precisely the kind of patient where it's so crucial to have had warnings, which there weren't then."  (Dr. Glenmullen dep., Pl.'s Ex. 2, 302.)  In other words, his expert opinion is that GSK provided inaccurate numbers that masked a much higher rate of suicidality for users of Paxil than those on placebos.  It is unclear from the testimony and excerpted passage, however, what other numbers were "bad," or whether it was a deliberate attempt by GSK to hide the risk of suicidal behavior.

Plaintiffs also point to an e-mail correspondence from early June 2003 between Drs. Russell Katz and Andrew Mosholder, both of the FDA.  (Pl.'s Ex. 6.)  Dr. Katz wrote on June 2, 2003, that he had "recently become aware of a presumed association between Paxil and suicidality in pediatric patients" and that he had received a partial response to a request by the FDA to "further elaborate the events subsumed under the preferred term 'Emotional Liability.'"[5]  Id.  According to Dr. Katz, the partial response showed that the rate of "possible suicide related events" that occurred during treatment or within four days of discontinuing treatment were "0.14/patient-year on drug, and 0.05/patient-year on placebo, p=0.02."  Id.

Dr. Katz considered this a "major finding" and was "worried," even though he had some problems with the methodology used to capture the cases.  Id.  He further stated that "[t]he sponsor has not proposed labeling the changes, and makes a feeble attempt to dismiss the finding."  Id.  He suggested further analysis of responses of other SSRI antidepressant drugs to determine whether similar events were "being hidden by various inappropriate coding maneuvers" and calling the sponsor to "ask some questions about their methodology."  Id.  The

---

[5] The response came from a "sponsor," but it is unclear from the e-mail whether that sponsor was GSK or a third party.

next day, Dr. Mosholder responded that "a number of SSRI pediatric supplements showed

signals for behavioral adverse events.  But these were mainly events such as agitation and

hypomania, not self-injury (unless, as you suggest, they were similarly obscured by inappropriate

terminology)."  Id.

Taken together, there is evidence that GSK provided the FDA with bad numbers or

masked its data under "inappropriate" and "preferred" terminology such as "Emotional

Liability."  Dr. Glenmullen stated in his deposition that patients like Tricia are "precisely the

kind of patient where it is crucial to have had warnings" because there is a "six-fold increase [in]

the risk of suicidality."  In light of this evidence, this Court cannot find that GSK's 2003 label

was adequate as a matter of law.[6]  Since there is a dispute as to the label's adequacy, this Court

is precluded from finding that Nurse Schertz was a "learned intermediary" as a matter of law.

Therefore, it would be inappropriate to grant summary judgment for GSK on this ground.

*Causation*

Having determined that there is a genuine issue of material fact on whether Nurse Schertz

was a learned intermediary, the analysis now turns to whether there is a genuine issue of material

fact on whether Paxil and its allegedly inadequate label proximately caused Tricia's death.

Specifically, GSK argues that Plaintiff has shown no specific evidence that (1) Paxil causes an

increased risk of suicide in patients like Tricia and (2) Nurse Schertz would have changed her

decision to prescribe Paxil if she had known of the risks documented in the 2006 warning.

Clearly, there is a genuine issue of material fact as to whether Paxil was the cause-in-fact

of Tricia's suicide.  GSK provides the depositions of Danny Dones ("Dones") and Jason

---

[6] During the approval phase of Paxil and other SSRIs in the early 1990s, some studies connected the use of SSRIs like Paxil with an elevated risk of suicidal behavior.  See Pl.'s Exh. 5 (Dr. Glenmullen's report states that "Teicher and Cole reported the phenomenon with SSRIs the previous year in 1990, precipitating a furor.")  Notably, neither party argues or presents evidence that the risk of suicide was well-known within the medical community in 2003. Therefore, the Court cannot grant summary judgment on that ground.

Pemberton ("Pemberton"), which tend to show that Tricia told her friends on two occasions prior to taking Paxil that she had thought about committing suicide. Dones testified that in early 2003 – several months before Tricia started taking Paxil – Tricia "indicated that she had been feeling depressed and had been having suicidal thoughts" and that she had told him that "she had mixed some chemicals together and was keeping them so that she could drink them and commit suicide." (Dones dep., Def.'s Ex. B, 39.) Shortly after Valentines Day, 2003, she told Pemberton that "[s]he had just contemplated [suicide] or thought of it." (Pemberton dep., Def.'s Ex. C, 38-39.)

Plaintiffs interpret these statements as cries for attention rather than actual "intent" to carry out her suicide. They rely on three sources for this argument. Dr. Glenmullen believed that Dones' statement that he believed Tricia was serious about committing suicide was merely "a reference now in retrospect, given that she's killed herself." (Glenmullen dep., Pl.'s Ex. 2, 291.) He believed that, if anything, Tricia's statements were a cry for attention rather than serious intent to commit suicide. Dones also noted that she had promised to pour out the lethal mixture and was going to seek help from a therapist. (Dones dep., Def.'s Ex. B, 39.) Finally, Pemberton stated that he believed Tricia would get out of her "rut" if she spent time with her friends. (Pemberton dep., Pl.'s Ex. 3, 39.) Whether or not a witness is credible is, of course, a question for the trier of fact. But GSK is not entitled to summary judgment even if Plaintiffs offered no evidence to create a factual issue as to whether Tricia was serious about committing suicide before taking Paxil. The increased risk of suicidality need only be a "material element and substantial factor," not the sole factor, in causing Tricia's suicide. Erickson v. Baxter Healthcare, Inc., 151 F.Supp.2d 952, 967 (N.D.Ill. 2001).

Cognizant of that, GSK argues that there is no statistical evidence that Paxil increases the risk of suicidality in adults.  Summary judgment for GSK would clearly be appropriate if Plaintiffs have no evidence that Paxil can cause an increased risk of suicide.  Therefore, GSK points to its April 5, 2006 submission to the FDA that "[a]n analysis of placebo controlled trials of adults with psychiatric disorders showed a higher frequency of suicidal behavior in young adults (prospectively defined as aged 18-24 years) treated with [Paxil] compared with placebo, although this difference was not statistically significant."  (Def.'s Ex. F, 3.)  Further, the report concluded that it was "difficult to conclude a causal relationship between [Paxil] and suicidality due to the small incidence and absolute number of events, the retrospective nature of the meta-analysis, and potential for confounding by the fact that the events of interest are a symptom of the psychiatric illnesses themselves."  Id. at 4.  GSK also cites the "Revisions to Product Labeling", which states that "[n]o suicides occurred in any of the pediatric trials.  There were suicides in the adult trials, but the number was not sufficient to reach any conclusion about drug effect [sic] on suicide."  (Def.'s Ex. I, 3.)

Conversely, Plaintiffs point to data showing that there is a statistical difference in suicidality in young adults.  First, there is the expert testimony of Dr. Glenmullen that Paxil can cause a "six-fold" increase in suicidality among patients.  (Dr. Glenmullen dep., Pl.'s Ex. 2, 302.)  Plaintiffs also note Dr. Glenmullen's testimony that the FDA had relied on GSK's "bad" numbers to approve the drug back in 1991.  (Pl.'s Ex. 5.)  Finally, Plaintiffs point to the 2006 Paxil Insert which stated that "[y]oung adults, especially those with [Major Depressive Disorder], may be at increased risk for suicidal behavior during treatment with [Paxil]."  (Def.'s Ex. E, 12.)

Both parties present contrasting evidence as to whether Paxil can increase the risk of suicidal thoughts and behavior. Perhaps the reason for this discrepancy is that the parties focus on different age categories; GSK cites data from adult trials, whereas Plaintiffs focus on data from young adult trials (those aged 18-24). Tricia died when she was 23 years old, according to the deposition of Nurse Schertz. Since that age is at the very cusp of the young adult range used in the studies, this Court is unwilling to say that as a matter of law, one party's evidence is irrelevant on this point. Further, there is evidence – albeit not directly cited by Plaintiffs – that "[the Major Depressive Disorder] data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24." (Def.'s Ex. F, 4.) In short, this Court cannot say that as a matter of law, Plaintiff has no evidence that Paxil was a substantial factor or material element in Tricia's suicide.

There is also a dispute over whether the label, assuming it was inadequate, was the proximate cause of Tricia's death. Illinois law is unsettled as to what elements, if any, Plaintiff has the burden of proving to establish that the inadequate label proximately caused Tricia's death. Plaintiffs argue that there is a so-called "heeding presumption" under Illinois law; that is, the law presumes that a doctor would have heeded an adequate warning label. See Mahr v. G.D. Searle & Co., 390 N.E.2d 1214, 1233 (Ill. App. Ct. 1979) (applying Texas law)[7]; Erickson v. Baxter Healthcare, Inc., 151 F.Supp.2d 952, 970 (N.D.Ill. 2001). Essentially, this means that a plaintiff need not show that the doctor would have changed his prescription if there was an adequate label. See, e.g., Erickson, 151 F.Supp.2d at 970. Alternatively, Plaintiffs argue that

---

[7] Although Mahr applied Texas law, the court noted that there was a lack of law on the subject in Illinois and that its ruling "was not contrary to the public policy of Illinois." 390 N.E.2d at 1229. Indeed, many subsequent failure-to-warn cases in Illinois have relied on Mahr. See, e.g., Proctor v. Davis, 682 N.E.2d 1203, 1212 (Ill.App.Ct. 1997); N. Trust Co. v. Upjohn Co., 572 N.E.2d 1030, 1037 (1991).

even if the presumption does not apply, there is evidence that Nurse Schertz would have changed her decision to prescribe Paxil if the label were adequate.

Conversely, GSK relies on another line of authority for the proposition that a plaintiff must "establish proximate causation by showing that had defendant issued a proper warning to the learned intermediary, [she] would have altered [her] behavior and the injury would have been avoided." Eck v. Parke, Davis & Co., 256 F.3d 1013, 1018 (10th Cir. 2001); see also Fisher v. Bristol-Meyers Squibb Co., 181 F.R.D. 365, 370 (N.D.Ill. 1998) (refusing to certify a class of plaintiffs because the issue of causation presented a wide array of individualized questions and answers, where each plaintiff would have to "show that his physician would not have prescribed [the drug] if the [drug manufacturer] had provided adequate warnings."); Thomas v. Hoffman-LaRouche, Inc., 949 F.2d 806, 812 (5th Cir. 1992), Willett v. Baxter Intern., Inc., 929 F.2d 1094, 1099 (5th Cir. 1991).

Alternatively, GSK argues that if there is a presumption, it may be rebutted by showing that the prescribing physician would not have changed her decision to prescribe the drug even if the label had been adequate. See Gebhardt v. Mentor Corp., 191 F.R.D. 180, 184-85 (D. Ariz. 1999) (finding presumption rebutted because physician had not read the warning labels); Miller v. Pfizer, 196 F.Supp.2d 1095, 1127 (D. Kan. 2002), aff'd 356 F.3d 1326 (10th Cir.), cert. denied, 543 U.S. 917 (2004) (finding presumption rebutted because physician testified that different warning would not have affected his decision to prescribe the drug); Seley v. G.D. Searle & Co., 423 N.E.2d 831, 838-39 (Ohio 1981) (finding presumption rebutted because patient did not inform physician about a latent medical condition that the drug could exacerbate).

The Illinois Supreme Court has not determined what elements a plaintiff must prove in order to prevail on the issue of proximate causation in a failure-to-warn case. However, the

Court finds it unnecessary at this time to determine whether a rebuttable "heeding presumption"

exists under Illinois law.  Even if a presumption existed, there is a genuine dispute of material

fact as to whether Nurse Schertz would have changed her decision to prescribe Paxil had she

known the information contained in the 2006 warnings, and had she known that Tricia had

suicidal thoughts prior to taking Paxil.  As such, summary judgment is inappropriate.  See Giles

v. Wyeth, Inc., 500 F.Supp.2d 1063, 1069 (S.D.Ill 2007) (declining to grant summary judgment

on the plaintiff's failure-to-warn claim because there was a genuine dispute of fact as to whether

the prescribing doctor would have changed his decision to prescribe the drug if the label

adequately warned of risks).

As GSK notes, courts that recognize a rebuttable heeding presumption have granted

summary judgment when the defendant unequivocally shows that the prescribing doctor did not

read the warnings.  See, e.g., Gebhardt, 191 F.R.D. at 184-85.  After all, if the doctor did not read

and rely on the warning label, it would not matter whether the label was adequate or not.  In this

case, however, Nurse Schertz did not testify that she had never read the label; rather, she "did not

recall" whether she read it or not (Nurse Schertz dep., 88.)  At the summary judgment stage, all

reasonable inferences are drawn in favor of the non-moving party.  Certainly, it is reasonable to

assume that Nurse Schertz did read the PDR and package insert at some point prior to

prescribing it, particularly since she testified that it was her "custom and practice" to read PDRs

and package inserts before prescribing the drugs.  Id. at 24-25.

GSK is also correct that courts that recognize a rebuttable heeding presumption have

granted summary judgment if the physician unequivocally testified that she would have

prescribed the drug even if the warning label were adequate.  See Miller, 196 F.Supp.2d at 1127

(drug manufacturer "successfully rebutted that presumption through [prescribing doctor's]

16

testimony that a different warning would not have mattered."). Nurse Schertz testified that she would still have prescribed the drug even if she knew of the information contained in the 2006 "Dear Health Care Provider" letter because Tricia did not tell her about her prior suicidal thoughts (Nurse Schertz dep. 58, 62-63.) Yet, she also testified that if she knew Paxil would increase the risk of suicide, she would not have prescribed it. Id. at 74-75.[8] She also noted at several different points that the information in the 2006 warning was something she would have liked to have known prior to prescribing the drug, id. at 40, 43, 46, and that she would have provided the warning to Tricia if she knew about it, id. at 44.

GSK also cites a case from the Ohio Supreme Court, Seley v. G.D. Searle & Co., 423 N.E.2d 831, 838-39 (Ohio 1981), where the court entered judgment for the defendant drug manufacturer because the patient had never told her physician that she had a prior history of hypertension associated with pregnancy, which put her at a higher risk of high blood pressure when on the drug, even though the warning label said nothing about this risk. GSK argues that because Tricia did not tell Nurse Schertz about her suicidal thoughts, even an adequate warning label would not have made Nurse Schertz reconsider her decision to prescribe the drug. Indeed, as stated above, Nurse Schertz testified that she still would have prescribed the drug even with an adequate label because Tricia never told her that she had suicidal thoughts before taking the drug. She also testified, however, that she would not have prescribed Paxil if she knew it increased the risk of suicide in her patients (Nurse Schertz dep. 74-75.) Given this apparent conflict, it is up to the jury to decide whether or not Nurse Schertz would have prescribed the drug to Tricia with an adequate label, if Tricia did not tell her about her suicidal thoughts.

*Punitive Damages*

---

[8] GSK's objections to the form of the question are overruled.

17

GSK also contends that as a matter of law, Plaintiffs are not entitled to recover punitive damage on any theory of liability.  In Illinois, "[p]unitive damages are similar to criminal penalties and are permissible only in cases in which torts 'are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'"  Proctor v. Davis, 682 N.E.2d 1203, 1216 (Ill.App.Ct. 1997), *quoting* Kelsay v. Motorola, Inc., 384 N.E.2d 353, 359 (Ill. 1978).

Thus, in Proctor v. Davis, the court affirmed an award of punitive damages when a pharmaceutical company knowingly manufactured and marketed a drug that caused blindness if applied in a particular "off label" manner without warning healthcare providers of that side effect.  682 N.E.2d at 1212.  In fact, evidence showed that the company deliberately allowed physicians to use the drug in the "off label" manner for human testing.  Id. at 1215.  The court found that this presented "sufficient evidence of willful and wanton conduct" to sustain a punitive damages award.  Id. at 1216.

Even if a jury found that GSK committed "willful and wanton conduct" by concealing the suicide risk from healthcare providers, Plaintiffs cannot recover punitive damages under Illinois law in this wrongful death case.  The Illinois Supreme Court has decided that "Illinois does not permit the recovery of punitive damages in a wrongful death action."  In re Air Crash Disaster, 644 F.2d 594, 605 (7th Cir. 1981); *citing* Mattyasovszky v. West Town Bus Co., 330 N.E.2d 590, 510-11 (Ill. 1975) (refusing to change "the law of this State which for more than a hundred years has limited recovery under the Survival Act to compensatory damages.").  While the Illinois Survival Act, 755 ILCS 5/27-6, allows certain common law claims, including "damages for an injury to the person" and "actions for fraud or deceit" to survive the death of the decedent,

18

Illinois case law does not permit recovery of punitive damages for wrongful death actions.  See

Froud v. Celotex Corp., 456 N.E.2d 131, 136 (Ill. 1985) (common law punitive damages claim

against asbestos manufacturers did not survive death of asbestos victims).

There are two recognized exceptions where a decedent's executors may recover punitive

damages for wrongful death.   The first is when an independent statute expressly authorizes

recovery.  See, e.g., Nat'l Bank of Bloomington v. Norfolk & Western Railway, 383 N.E.2d 919,

922-23 (Ill. 1978) (allowing recovery of punitive damages after death under the Public Utilities

Act).  In this case, Plaintiffs cite no statute which would expressly permit recovery for any of

their theories of liability; thus, this exception is inapplicable here.  A second exception is when a

"strong equitable consideration" exists; for example, if denying punitive damages would

preclude the plaintiff from any remedy.  See Mattyasovszky, 330 N.E.2d at 512.  In this case,

however, compensatory damages are still available to Plaintiffs; thus, this exception is also

inapplicable here.

Proctor, which the Plaintiffs cite for the proposition that a plaintiff may recover punitive

damages for products liability and fraud cases, is not inconsistent with the general Illinois rule

that Plaintiffs may not recover punitive damages for wrongful death actions.  In Proctor, the

plaintiff did not die:  he was blinded by the "off label" use of the drug.  682 N.E.2d at 1206.  In

the case at hand, however, Tricia did die.  Illinois law therefore permits her executors to raise

products liability, fraud, and other common law claims against GSK, but precludes them from

recovering punitive damages.

The Court notes in concluding that neither party specifically addressed the Plaintiffs'

common-law fraud claim against GSK, even though GSK moved for summary judgment on all

five of Plaintiffs' theories of liability.  One of the elements of a common-law fraud claim in

Illinois is that the defendant knew that his statements or representations were false.  Wernikoff v. Health Care Service Corp., 877 N.E.2d 11, 16 (Ill.App.Ct. 2007).  Since GSK does not argue in its motion or reply that Plaintiffs have no evidence that GSK knew its representations to be false, the Court does not address that element of the fraud claim at this time.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment [#76] is DENIED IN PART and GRANTED IN PART.  Specifically, the Motion is DENIED with respect to the issues of the learned intermediary doctrine and causation, and GRANTED with respect to the issues of the express warranty and punitive damages.

ENTERED this 2nd day of July, 2010.

                                                    s/ Michael M. Mihm
                                                    Hon. Michael M. Mihm
                                                    U.S. District Judge